New Orleans, Mobile and Chattanooga Railroad Company v. City of New Orleans.

## No. 3701.

NEW ORLEANS, MOBILE AND CHATTANOOGA RAILROAD COMPANY *v.* CITY OF NEW ORLEANS et als.  CHARLES MORGAN, Intervenor.

A municipal corporation possesses two classes of powers and two classes of rights—public and private. In all that relates to one class, it is merely the agent of the State and subject to its control. In the other, it is the agent of the inhabitants of the place—the corporators—maintains the character and relations of individuals, and is not subject to the absolute control of the Legislature—its creator. Among this latter class is the right to acquire, hold and dispose of property—to sue and be sued, etc.—just as certain rights are conferred on private corporations and persons, not *sui juris*, such as minors and married women, but are not afterwards, as long as they exist, under the control of the Legislature.

A municipal corporation may own property, to and over which the Legislature has, while said corporation exists, no right or control in opposition to or independently of the will or consent of the corporation.

It is a manifest fact to all that the incorporation of such a city as New Orleans is a necessity. The multiplying and complicated interests of the compact and increasing community are such that the Legislature can not administer them; and some of them are of such a nature as not to be within mere legislative action, but are to be conducted under general rules, thus necessitating the creation of an intellectual body, with something more than governmental functions, but which do not constitute an *imperium in imperio*.

If then a municipal corporation can acquire the fee simple of property, the squares intended for the depots of the plaintiffs were so acquired, and they can not be taken by the Legislature, while the city corporation exists.

The Legislature expressly recognized and ratified the compromise of September, 1820, between the city and certain riparian proprietors in relation to the property in question, imposing conditions which were complied with. The theory that the city acquired the property simply as the agent of the State can not be accepted, because the city can own private property, and because the former owners intended to, and did, by the act of twentieth June, 1851, transfer the title thereof to the city, subject only to the uses of commerce and of the public, while so needed.

The injunction in this instance was improperly issued against the defendant—the city of New Orleans—but as the city has made no claim against the plaintiffs, a demand in reconvention can not be admitted, and a decree inhibiting the plaintiffs from occupying the property in controversy could not be granted.

Under the pleadings, all that can be done is to render judgment in favor of the city dissolving the injunction and dismissing plaintiffs' suit, leaving the parties to their rights, under the laws relative to the expropriation of property.

APPEAL from the Eighth District Court, parish of Orleans. *Dibble, J. J. A. Campbell* and *J. B. Eustis,* for plaintiffs and appellees. *George S. Lacey,* City Attorney, and *W. W. King,* for defendant and appellant. *Miles Taylor* and *Leovy & Monroe,* for intervenor.

WYLY, J. The question presented in this case is the same as that just decided, and for the reasons therein given.

It is ordered that the judgment herein be annulled, and the injunction be dissolved; and it is now ordered that there be judgment for the city of New Orleans, and that the prayer of the latter in reconvention be granted, and it is ordered that the plaintiffs be restrained and inhibited from occupying the property in controversy. It is further ordered that plaintiffs pay costs of both courts.

## ON REHEARING.

HOWELL, J. The plaintiff company injoined the city of New Orleans from leasing or selling, and from interfering with plaintiffs in occupying and enjoying, holding and acquiring certain lands granted to the plaintiffs by and described in the following clause of section 15 of act No. 26 of 1869, to wit: "And there is hereby granted to the said company the right to locate, construct, maintain and use a passenger depot, with office and apartments suitable for its legitimate business, upon the part or portion of the levee or streets and grounds in the city of New Orleans, bounded by Canal, Delta and Poydras streets, and a line parallel to and one hundred and fifty feet easterly from Delta street; and for the construction of a freight depot, and for other purposes of its legitimate business, to inclose and occupy the blocks of ground, parts of streets and portion of levee in said city, bounded by Girod, Water and Calliope streets, and a line parallel to and two hundred and ninety feet easterly from Water street; *provided*, said company shall not inclose or occupy that part or portion of the blocks of ground within said last named limits, which is the private property of individuals, until said company has acquired the title thereto."

The plaintiffs allege that they have acquired by purchase all of the private property within the boundaries of the said grant.

The only answer filed by the city to the original and supplemental petitions of plaintiffs in this suit has been disposed of, and is not before us; the other answers are to the intervention of Charles Morgan and this branch of the suit; but the question presented and discussed by both parties is the right of the State to make the said grant, the city claiming to be the owner of the said ground, subject only to a servitude in favor of the public as long as it may be needed for public purposes, and the State asserting absolute ownership and control of the lands as public places.

If they be "public places" in the ordinary, legal signification of these words, it may be that the State has the control asserted. We will here inquire into the rights of the city to the lands.

In 1820, the batture in that portion of the city was owned or claimed by the heirs and assignees of one Bertrand Gravier, as riparian proprietors, and there being some difficulty with the city as to the ownership and use thereof, the parties interested entered into a compromise by notarial act, in September of that year, by which it was stipulated that all lots of ground outside of a certain line should remain inalienable, and be used for no other public purposes than those for which they are naturally destinated. When, in 1836, the city was divided into municipalties, it was provided that no disposition should ever be

made of the said batture in violation of said compromise, and that the Second Municipality, in which it was situated, should not obstruct the inhabitants of any portion of the city in the free use thereof. By the continued accessions, this space of ground became inconvenient for public use, and in 1850 the Legislature repealed that portion of the act of 1836 prohibiting any disposition thereof; authorized and directed the Second Municipality to lay off two additional streets according to a certain plan; declared that the balance of the batture should be left open and so kept for the accommodation of the public and the convenience of commerce, and that in the event of the agreement of the original parties to the said compromise, for the sale of the said batture, it should be the duty of the Second Municipality to lay off in lots all not needed for streets and public purposes as above, and dispose thereof on terms to be agreed on, provided one-third of the proceeds should be appropriated to the general sinking fund of the city.

In pursuance of this act, the said parties, with the Second Municipality, which was represented by a committee, agreed by notarial act on the twentieth June, 1851, to change the destination of the said batture made in the compromise of September, 1820; that three streets should be laid out, certain squares divided into lots and sold at auction within different periods of time and on specified terms, which sale should be binding on the parties then contracting with the Second Municipality as vendors; that the proceeds be divided into three parts, one to be paid to the said original parties, one to the general sinking fund of the city, and the other into the treasury of the Second Municipality; that three specified squares be reserved for market houses, and that portion not divided into lots for sale should be (in the language of the act) "vested in perpetuity and full ownership in the said Municipality No. 2," in favor of whom the said parties, then contracting therewith, ceded and relinquished forever all their claims in and to the said batture, as well as all and every enlargement thereof or accretion thereto by new formations.

It is by this act, it is contended, the city, which has succeeded to the rights of the Second Municipality, acquired the title to and full ownership of the ground now in controversy.

The title, it would seem, was thereby vested in the city, so far as the original owners, parties to the above act, could confer it, and the property is under the exclusive control of the city, as owner, for the benefit of the inhabitants and subject to the servitude in favor of commerce, if needed, unless there is in law some such relation between the municipal corporation and the State as makes all property acquired by the corporation the property of the State, and subject to its control. Is this so?

A municipal corporation is appropriately defined to be "the investing the people of a place with the local government thereof." Salk. 183. It has no powers not conferred upon it expressly or by fair implication, by the law of the State creating it or statutes applicable to it. Both the persons and the place inhabited by them are indispensable to the constitution of such a corporation. It is an agency to regulate and administer the internal concerns of a locality in matters peculiar to the place incorporated and not common to the State or people at large; but duties and functions may be and are conferred and imposed, not local in their nature. It possesses two classes of powers and two classes of rights—public and private. In all that relates to one class it is merely the agent of the State and subject to its control; in the other it is the agent of the inhabitants of the place—the corporators— maintains the character and relations of individuals, and is not subject to the absolute control of the Legislature, its creator. Among this latter class is the right to acquire, hold and dispose of property, to sue and be sued, etc. It is true, that these rights are originally derived from the Legislature; but once conferred they are to be exercised, while it exists, at the will of the corporation, in its own, and as to its own interest, for the inhabitants, just as certain rights are conferred on private corporations and persons, not *sui juris*, as minors and married women, but are not afterwards under the control of the Legislature. Dillon on Municipal Corporations, second edition, chapter 71, § 9 A to 10 A; chapter iv., § 38–40 and notes; Cooley's Constitutional Limitations, pp. 235-6, 238.

In § 39 Mr. Dillon says: "It may assist to an understanding of the extent of legislative power over municipal corporations proper (incorporated towns and cities) to observe that these, as ordinarily constituted, possess, according to many courts, a double character—the one governmental, legislative, or public; the other, in a sense, proprietary or private. The distinction between these, though sometimes difficult to trace, is highly important and is frequently referred to, particularly in the cases relating to the implied or common law liability of municipal corporations for the negligence of their servants, agents or officers in the execution of corporate duties and powers. In its governmental or public character the corporation is made, by the State, one of its instruments, or the local depositary of certain limited and prescribed political powers, to be exercised for the public good, on behalf of the State, and not for itself. In this respect it is assimilated, in its nature and functions, to a county corporation, which, as we have seen, is purely part of the governmental machinery of the sovereignty which creates it. Over all its civil, political, or governmental powers, the authority of the Legislature is, in the nature of things, supreme and

31

without limitation, unless the limitation is found in some peculiar provision of the Constitution of the particular State. But in its proprietary or private character, the theory is that the powers are supposed not to be conferred, primarily or chiefly, from considerations connected with the government of the State at large, but for the private advantage of the particular corporation as a distinct legal personality; and as to such powers and to property acquired thereunder, and contracts made with reference thereto, the corporation is to be regarded as *quo ad hoc*, a private corporation, or, at least, not public, in the sense that the power of the Legislature over it is omnipotent."

Mr. Cooley, at page 238, says: "The rule upon the subject we take to be this: Where corporate powers are conferred, there is an implied compact between the State and the corporators that the property which they are given the capacity to acquire for corporate purposes, under their charter, shall not be taken from them and appropriated to other uses. If the State grants property to the corporation, the grant is an executive contract which can not be revoked. The rights acquired, either by such grants or by any other legitimate mode in which such a corporation can acquire property, are vested rights, and can not be taken away."

In 29 Vermont, p. 12, it was said: "But while the legislative power (to enlarge, restrain or even destroy municipal corporations, as the public interests may require) may be exercised over public and municipal corporations, it has uniformly been held that towns and other public corporations may have private rights and interests vested in them under their charter; and as to those rights, they are to be regarded and protected the same as if they were the rights and interests of individuals or private corporations."

In 18 Cal. 590, Mr. Chief Justice Field, as the organ of the court, takes the ground that the real estate or private property of a municipal corporation is protected by the clause in the national constitution securing the inviolability of contracts; that all legislative authority over it must be exercised in subordination to this guarantee, and that it is subject to legislative control to the same extent, but no greater extent, than all other property in the State.

In 9 Cranch. (U. S.) 336 and 52, Mr. Justice Story expresses the opinion that, "in respect to public corporations, which exist only for public purposes, such as counties, towns, cities, etc., the Legislature may, under proper limitations, have a right to change, modify, enlarge or restrain them, securing, however, the property for the uses of those for whom and at whose expense it was originally purchased." This is reiterated by Chancellor Kent, 2 Com. 305, and by Mr. Justice Washington in Dartmouth College case, 4 Wheat. 518, 663. In this last case,

Mr. Justice Story, at page 694, says: "But it will hardly be contended that, even in respect to such corporations, the legislative power is so transcendent that it may, at its will, take away the private property of the corporation, or change the uses of its private funds acquired under the public faith."

In 18 L. 213, it is said: "Urban property fronting on a water course is entitled to alluvion as well as rural estates; and cities may acquire *jure alluvionis*, but it must be as proprietor of the front or riparian proprietor." See also 10 An. 54, and 7 An. 505.

We are aware that very different views have been expressed by very high authority, and that some of the authors and jurists from whom we have quoted have used language susceptible of a different construction, and declared the division of municipal powers into public and private unsatisfactory; but after a careful consideration of the opinions on both sides, we have come to the conclusion that a municipal corporation may own property, to and over which the Legislature has, while such corporation exists, no right or control in opposition to or independently of the will or consent of the corporation; and we think this is consonant with justice. There is a principle involved in it—the principle that those who have to pay should have a voice in the disposal of what is paid for—a principle which is a barrier to centralized or organized power—a principle that protects every person in the control of his own private affairs—a principle which the judiciary is intended to maintain.

The theory or argument that the Legislature has absolute ownership and control of all the property and rights of a municipal corporation, because the corporation is represented in the Legislature, is not conclusive. Such representation is only in matters properly within legislative action, just as the representation of all other portions and inhabitants of the State. The private rights of the corporation are as much protected as those of individuals. And it is a fact, manifest to all, that the incorporation of such a city as New Orleans is a necessity. The multiplying and complicated interests of the compact and increasing community are such that the Legislature can not administer them, and some of them are of such a nature as not to be within mere legislative action, but are to be conducted under general rules, thus necessitating the creation of an intellectual body, with something more than governmental functions, but which do not constitute an *imperium in imperio*.

If, then, a municipal corporation can acquire the fee simple of property, we think the squares, intended for the depots of the plaintiffs, were so acquired and they can not be taken by the Legislature while the city corporation exists. The Legislature expressly recognized and

ratified the compromise of September, 1820, in which the parties, donating or destinating, acted as riparian proprietors, and in the act 257 of 1850, the section of the act of 1836, prohibiting the violation of said compromise was repealed, and the Municipality No. 2 was authorized to enter into an agreement with the said parties "for the sale of the said batture," on certain conditions which are complied with. If it be urged that the third section of said act of 1850 required the portion, not then laid off into streets, to be kept open forever for commerce, the answer is that act No. 333 of 1853 authorized the withdrawal therefrom of such as may not be needed for public uses, and this has been done by the city (which can not sue itself) in the subsequent laying off of other streets and selling of two and a half squares in the block of squares (within the State grant) nearest the river, and which have been purchased by the plaintiffs. All this is recognized by the Legislature in the act under which plaintiffs now claim, by requiring them to purchase, and by them in making the purchases. While this legislation may be construed as making such recognition, it can be invoked in aid or support of the power to make this grant, only on the theory that the city owned the property simply as the agent of the State, a theory which we do not adopt, as to this property; because we think the city can own private property, and that the former owners intended to, and did, by the act of June 20, 1851, transfer the title thereof to the city, subject only to the uses of commerce and of the public while so needed. And such must have been the opinion of the plaintiffs when they made the offer, which they allege, to purchase a part of this very ground from the city about the time this suit was instituted; and their petition seems to be constructed on the hypothesis that the city had such rights to the said property as to make a resort to the laws relative to expropriation necessary.

The act of 1850 may have been necessary to give the Municipality No. 2 the authority to enter into an agreement with the owners; but the power having been exercised and the conditions complied with, the title of said parties (which was recognized in the said act) vested by the notarial act of June, 1851, as we think, in the municipality, which then took the place of the said former owners, with all their rights, including the right to bring into commerce such portions as might become unnecessary for public use.

It is contended, however, that the case of Parish v. Municipality, 8 An. 145, fixes the character of the ground in question as a *locus publicus,* in the technical sense of this term, and intimates that so much of the act of 1850 as may confer any rights upon the municipality is unconstitutional. An examination of that case will show that the matter in controversy was the servitude of view and way claimed by

plaintiff, and that the case went off on an exception that plaintiff had no cause of action. The right, therein asserted, of the Legislature to change the destination of a portion of the batture previously dedicated to the public use is not denied; but this is not inconsistent with the right of the riparian proprietor to sell his property, and his right or that of his vendor to withdraw that property from the position of a *locus publicus,* when not needed as such, under existing legislation.

The antecedent cases had reference to the legislation and the rights of parties thereunder, prior to the act of 1850 and the transfer of June, 1851, under which the rights of the city have been acquired. But in those cases the rights of riparian proprietors to the batture were recognized, subject to a public servitude, and the ownership of the city, as against said proprietor, was denied. Judge Martin, however, in 18 La. 249, contended that the formations in front of the city did not belong to owners of the lots along a certain line, but vested in the city, and he insisted that his views were sustained by the decision of the United States Supreme Court in 10 Peters 662. The majority of the court decided in favor of the riparian proprietors, and we think those parties have conveyed their rights to the portion of the batture now in controversy to the city for its inhabitants; that those rights are protected by the constitution now, just as those of the former owners were, the city having the capacity to own property for the exclusive use and benefit of the inhabitants, and having acquired all the rights of the former owners, and that the city or inhabitants can not be compelled to contribute the squares of ground in question to the plaintiff without compensation. Whether they will or will not make such contribution voluntarily, in consideration of the benefit resulting from the establishment of the railroad, is a question not pertinent here. We are to pass only on the legal rights of the parties.

In our opinion the injunction improperly issued in this case. But as the city has made no claim against the plaintiffs, our former decree was erroneous in granting a demand in reconvention and inhibiting the plaintiffs from occupying the property in controversy. Under the pleadings, all we can do is to render judgment in favor of the city dissolving the injunction and dismissing plaintiffs' suit, leaving the parties to their rights under the laws relative to the expropriation of property.

It is therefore ordered that our former decree be set aside, and it is now ordered that the judgment appealed from be reversed, and that there be judgment in favor of the defendant, the city of New Orleans, dissolving the injunction herein and dismissing plaintiffs' suit, with costs in both courts, without prejudice to the rights of the parties under the laws of expropriation.

· Mr. Justice WYLY concurs in this decree for the reasons given by him in the former opinion of the court.

LUDELING, C. J., *dissenting.* In February, 1869, the General Assembly of the State of Louisiana passed an act whereby was granted to said company, "the right to locate, construct, maintain and use a passenger depot, with office and apartments suitable for its legitimate business, upon the part or portion of the levee, or streets, or grounds in the city of New Orleans bounded by Canal, Delta and Poydras streets, and a line parallel to and one hundred and fifty feet easterly from Delta street, and for the construction of a freight depot and for the purpose of its legitimate business, to inclose and occupy the block of ground, parts of streets and portion of levee in said city bounded by Girod, Water and Calliope streets and a line parallel to and two hundred and ninety feet easterly from Water street; provided said company shall not inclose or occupy part or portion of the blocks of ground within the said last named limits, which is the private property of individuals, until said company has acquired the title themselves." Learning that the city of New Orleans was about to pass an ordinance to cede away a part of the batture or levee, which, in the act of 1869 aforesaid, the State had authorized the company to use, for its freight and passenger depots, the company injoined the city from passing the ordinance, etc.

The city claims to have the perfect ownership of the property in question, and to be alone authorized to dispose of it, without any right on the part of the State to control its disposition. If it were conceded that the city had a perfect title, as owner, to the batture, its pretension to absolute control over the property, unrestrained by the General Assembly of the State, would be unfounded in law and in fact. It can not be disputed that the General Assembly has the power to abolish the charter of the city and to control its property for the benefit of the public, through other agents. As a matter of fact, the Legislature could do this if it chose, and the courts would be powerless to prevent it. And the right of the General Assembly to control property of a municipal corporation, dedicated to public use, is not less clear.

The Supreme Court of the United States said (in the case of New Orleans v. United States, 10 Peters, 722), "it can not be insisted that the dedication of this property to public use, whether the title to the thing dedicated became vested in the city, or only its use, could withdraw it from the political jurisdiction of the sovereign power." And in the same case it is decided that this sovereign power is the State. See p. 737.

This right of the General Assembly is a part of the governmental or political power of the State, which is in no way subordinated to the municipal corporations. The city of New Orleans, if owner of this batture, is only the agent of the State; any control which it exercises over the property is a police or governmental power, delegated by the State, subject to its control, and to be exercised only in subordination to its will. Police Jury vs. Shreveport, 5 An. 661; 24 An. 242; 1 An. 167; 3 An. 306; 12 An. 515; 14 An. 406; 27 New York, the People v. Kerr, 188; Cooley's C. L. 191; Dillon on Corporations p. 70.

In Reynolds v. Baldwin this court said: "In the country from which we derive our ideas on the subject of municipal corporations, the charters of cities were, as their name implies, contracts entered into between the corporators on the one hand and the king or feudal lord on the other, by which liberties and franchises were bartered for personal service or money. The rights and powers which those charters conferred were of the nature of those secured to the people at large by our constitutions. They were intended to be permanent, and could not be lawfully taken away. They were, in the true sense of the word, franchises. But the relation existing between our municipal corporations and the sovereign is not the same, and it is strange that this fact should continue to be so obstinately overlooked by their officers." And the court adds, referring to the thirty-third section of the old constitution: "This provision constituted the municipal government of this city a subordinate agency for purposes of police and good order. The laws which under that provision have established and regulated the municipalities are not contracts; they are ordinary acts of legislation. The powers they confer are no longer franchises in the ordinary meaning of that word; they are nothing more than mandates, and those laws may be repealed at pleasure, except so far as their repeal may affect rights acquired by third persons under them. They are all of the same nature, and must be construed and applied in all cases like other laws." 1 An. 168.

But the city has not the fee simple or perfect ownership in the property in question; it is a public thing.

Ordinarily, the judicial admissions of parties to a suit are conclusive against them. "A judicial admission, solemnly made, can not be denied." 4 An. 416; 11 An. 710; 4 M. 280.

If this rule of evidence be not ignored, it will be sufficient to refer to the answer of the city, found on page forty-five of the record, to prove that the property in question is a public thing. The city declares "that all that portion of real estate or ground claimed by intervenor, situated above Canal street, and embraced by ordinance 1492, forms a part of the batture lying in the old faubourg Ste. Marie,

and that on or about the twentieth day of September, A. D. 1820, a certain act was entered into by and between Edward Livingston and other riparian proprietors and the city of New Orleans, wherein and whereby the entire alluvion or·batture in front of the aforesaid suburb Ste. Marie, and the accretions thereafter to become attached to the. same, were dedicated to public use and the purposes of business and commerce, and upon the express understanding and condition that the same should thereafter remain and continue a *locus publicus*, out of commerce, and not to be affected by any adverse claim or grant which might be set up against the same; that for many years anterior to the authentic act of dedication above referred to, and more than fifty years previous to the passage of the acts of the Legislature of the State of Louisiana referred to in the intervenor's petition, certain riparian proprietors owning property in the said faubourg Ste. Marie, without any particular form or ceremony, converted the entire batture in front of such suburb a *locus publicus*, and set the same apart for the use of the public, composed almost entirely of citizens of the United States, upon the condition that the batture thus informally dedicated should remain to be solely appropriated to that purpose." And in their original briefs the counsel for the city reiterated these admissions.

How then can the city be permitted now to deny that the property is a public thing? What are public things? The Code declares: "Public things are those, the property of which is vested in a whole nation, and the use of which is allowed to all the members of the nation; of this kind are navigable rivers, seaports, roads, harbors, highways, and the beds of rivers, as long·as the same is covered with water." C. C. article 453.

"Things which are for the common use of a city or other place, as streets and public squares, are likewise public things." C. C. 455.

"Things, which belong in common to the inhabitants of cities and other places, are two kinds: Common property, to the use of which all the inhabitants of a city, or other place, and even strangers, are entitled in common, such as streets, the public walks, the quay; and common property, which, though it belongs to the corporation, is not for the common use of all the inhabitants of the place, but may be employed for their advantage by the administrators of its revenues." C. C. 458.

"Private estates or fortunes are those things which belong to individuals." "Les choses qui sont dans le domaine de chaque individu forment les biens et les richesses particulières." C. C. 450.

These citations from the Code show (according to my understanding), that the property in question is a public thing, and that a city can not own private estates or fortunes. All its property comes under

one of the two classes of public things mentioned in article 458. And whether the city can acquire or alienate property depends upon the will of the Legislature, expressed in the charter or some other legislative act; and this power can be revoked or resumed at will by the State.

The history of the rights of the city to this batture shows conclusively that it was dedicated to the public. In 1763 the Jesuits' plantation was confiscated and sold by the French. The first lot on the plan was sold to Pradel, and was conveyed by him to Bertrand Gravier. Gravier laid off lots on the front previous to his death. After his death the tract was adjudicated to John Gravier, one of his heirs, who sold to Edward Livingston. In 1805 a jactitation suit was brought, in the name of John Gravier, against the mayor, etc., of New Orleans, on account of the pretensions the city had set up to this property. In 1807 the Superior Court decided that the evidence in that case showed that Gravier was the riparian proprietor. In 1819 the co-heirs of John Gravier sued him to set aside the adjudication made in his favor and for a partition of the property of Bertrand Gravier. See 6 Mart. 281. In the same year the suit of Morgan v. Livingston and others was decided. It was determined in that case that there was no batture formed at the time Gravier's sales were made, and that whatever of riparian ownership he had, passed with those sales. In 1820, and in all probability in consequence of that decision, the compromise between the Gravier and Livingston party and the city was made. In all these proceedings the State, as representing the public, had never been a party.

In 1836 the city charter was amended, and this compromise was tacitly ratified by the State. In 1850 an act of the Legislature authorized the sale of two tiers of lots in front of two streets to be laid off on the batture in front of New Levee street, and directed what disposition should be made with the proceeds of the sales. The same act declares that the batture or space of ground adjoining the Mississippi river and the street to be laid off, etc., fronting said river, "shall be left open and so kept for the accommodation of the public and the convenience of commerce. Acts of 1850, p. 197.

The parties to the compromise of 1820 accepted the terms of this act, and, if not before, this batture was then dedicated to the public by all concerned. But in Municipality v. Cotton Press, 18 La. 230, this court, referring to the case of Municipality No. 1 v. Municipality No. 2, 12 La. 491, relating to this batture, says: "In that case there was an express dedication to public uses of the alluvion in front of the suburb St. Mary by a formal contract between the city and front proprietors, and the act of 1836 refers to and sanctions that compromise, and ex-

pressly provides that the municipality of the upper section of the city
of New Orleans shall not in any manner obstruct or impede the in-
habitants of any portion of the city in the free use and enjoyment of
their rights in the batture. With such legislative injunction, how
could the municipality, with any propriety or consistency, pretend to
be the exclusive owner of a *locus publicus,* which it was their duty to
administer according to its destination." 18 La. 230   See also Pack-
wood *v.* Walden and Cockran et al. *v.* Fort et al., 7 N. S. 86 and 626.

In the case of Delabigarre *v.* Second Municipality, decided in 1848,
it had been expressly decided that the batture had been dedicated to
the public use, and that the attempt of the municipality "to change
the destination of the ground was a glaring usurpation of power, from
which no legal effects could result." 3 An. 239. And this decision no
doubt led to the passage of the act of 1850 aforesaid.

In 1851 the case of Parish *v.* Second Municipality was decided. In
that case the plaintiff complained that the act of 1850 was unconstitu-
tional, pretty much on the same grounds urged now against the act of
1869. This court decided that the property was a public place, and
that the Legislature had the right to alter the destination. 8 An. 145.
The other cases which follow adopt this conclusion without discussion.
10 An. 54; 12 An. 500; 13 An. 154; 10 Peters 662.

If an unbroken chain of decisions of this court, for upwards of half
a century, can settle the question about that seemingly endless source
of litigation, the batture in front of the city of New Orleans, it has
been settled that the batture is a public thing.

I understand that a majority of my associates do not deny that the
State alone can control "public things."

The jurisprudence of this State and most of the other States of the
Union is settled that the sovereign alone has the right to control pub-
lic places or to change the destination of public things. 5 La. 132; 13
La. 326; 18 La. 218; 3 An. 230; 8 An. 149. In the case last mentioned
this court said: "As we held in the case of the State of Louisiana *v.*
the Executors of McDonogh et. al., such a stipulation was at all times
under the control of the Legislature, who could modify the effects of
it and change the destination of the property whenever such a change
became of public advantage. Its power to change the destination of
it was expressly recognized by us in the case of Delabigarre *v.* Second
Municipality. The power of the Legislature to change the destination
of public places had been previously recognized in the case of De
Armas *v.* the Mayor et als.; the Mayor *v.* Hopkins; New Orleans *v.*
United States, and Municipality *v.* Cotton Press. These cases were all
argued by the ablest counsel at the bar, and the opinions of the court
were prepared with uncommon care. In two of them, Judge Martin

dissented on other points; but the court was in all the cases unanimous in recognizing the power of the Legislature to change the destination of the quay and of the batture in front of the city of New Orleans," etc. P. 149; 5 An. 661; Cooley Lim. 552; 2 Dillon § 511; 4 Pet. 232; 45 N. Y. 234; 1 Redf. 260; 22 Miss. 13; 20 Mo. 192; 18 Cal. 490; 13 Ill. 30; 31 N. Y. 164, 202; 8 Dana 50; 12 Ill. 60; 15 Tex. 388.

If the General Assembly had the power to control the quay and batture in front of New Orleans in 1851, when and how has it lost this power?

I come now to inquire whether there be any difference in the power of the State to grant lands for depots and privileges to use the streets? I confess my inability to see any. It is the grant of the use of a *locus publicus* for a public use, in each instance. The use is specific. The dedication is defined, and no other employment of it can be made. The power of the General Assembly in appropriating money or property belonging to the public is subject to no other limitation than is imposed in the constitution. 16 Wal. 678; 21 N. Y. 597; 15 Wend. 374; 11 La. An. 338. Depots are necessities for the running and operating of railroads, and for the proper prosecution of the business in the interests of the public. They may be regarded as indispensable to the accomplishment of the general purposes of the corporation and the design of the legislative grant. 46 N. Y. 546.

The decision of this case depends entirely upon whether or not the act of the General Assembly of 1869, in favor of the plaintiff, be constitutional or not. It can not be denied, that at least, there is serious grounds for doubts on the subject; and under the settled jurisprudence of this court and of the Supreme Court of the United States, that it is a sufficient reason for not declaring the law void.

I therefore dissent from the opinion and decree of the court.