MONROE, C. J., takes no part, not having heard the argument.

O'NIELL, J., dissents.

---

(69 South. 739)

No. 21123.

ACME LUMBER CO., Limited, v. BOARD OF COM'RS OF PORT OF NEW ORLEANS.

(June 29, 1915.   Rehearing Denied Oct. 18, 1915.)

*(Syllabus by the Court.)*

1. SALES ☞166—SALE OF LUMBER—COMPLIANCE WITH CONTRACT.

Under a contract for the sale of "B grade" lumber, to be delivered and unloaded by and at the expense of the seller, and measured and graded by the purchaser's inspectors, whose decision is final as to grade and measurement, it is not unfair for the seller to ship and tender for inspection a grade of lumber called "square edge and sound," containing principally "B grade" and some higher and some lower grade of lumber; the seller allowing the purchaser to take all the "B grade" and better, and removing the rejected lumber promptly at his own expense.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 391–400, 402; Dec. Dig. ☞166.]

2. MUNICIPAL CORPORATIONS ☞253 — PURCHASE OF LUMBER—INSPECTION—LIABILITY FOR PRICE.

When the lumber purchased by a municipal board has been inspected, measured, and accepted by the inspectors employed by the superintendent of the board, under a contract of sale stipulating that the superintendent or his authorized representative shall be the sole judge of the quality and measurement of the lumber, the board cannot legally withhold the price on the ground that "its inspectors were inexperienced and incompetent, and· made faulty, imperfect, and erroneous inspections," unless there was dishonesty on the part of the seller or collusion with the board's superintendent or inspectors.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 695; Dec. Dig. ☞253.]

3. MUNICIPAL CORPORATIONS ☞167—ACTS OF REPRESENTATIVES—LIABILITY.

A municipal corporation or board is responsible for the acts of its authorized representatives within the scope of their authority.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 375, 379; Dec. Dig. ☞167.]

4. SALES ☞372—SALE OF LUMBER—BREACH OF CONTRACT—EVIDENCE.

In an action to recover the profits which should have been made on lumber sold, but not delivered, on account of a breach of the contract, at the rate of profit made on the lumber which was delivered, the defendant may prove that his inspectors were incompetent, and that the profit made by the seller on the lumber that was delivered was due to the acceptance of lumber below the grade called for by the contract.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1089; Dec. Dig. ☞372.]

Appeal from Civil District Court, Parish of Orleans; T. C. W. Ellis, Judge.

Action by the Acme Lumber Company, Limited, against the Board of Commissioners of the Port of New Orleans. From judgment for plaintiff, defendant appeals. Modified and affirmed.

James Wilkinson, of New Orleans, for appellant. J. F. Pierson and P. M. Milner, both of New Orleans, for appellee.

O'NIELL, J. In December, 1912, the board of commissioners of the port of New Orleans advertised for sealed proposals to furnish and deliver to the board such lumber as might be ordered for repairs, etc., during a period of one year. A circular accompanied the advertisement, informing bidders that the board would require approximately 1,700,-000 feet, board measure, and stated approximately the quantity of each of the principal dimensions that would be needed during ·the year.

Bids were invited per thousand feet, board measure, of yellow pine lumber of "B" grade, as defined by the classification of the Contractors' & Dealers' Exchange of New Orleans. The specifications provided that the contractor should furnish all the lumber or-

dered by the superintendent, which should meet the requirements of the specifications, and that the contractor should furnish all possible conveniences for the inspection of the lumber by the superintendent or his representative. The specifications declared that the term "superintendent," as used therein, meant, not only the superintendent of the board, but also his duly authorized representative. It was stipulated that all of the lumber should be subject to the approval of the superintendent, who should be the sole judge of the quality thereof and the measurements, and that, if any lumber should be rejected, it had to be removed at once by the contractor and replaced as soon as possible by proper material, and that the superintendent should be the sole judge of the meaning of the specifications wherever they were silent or inexplicit on any subject. Payments were to be made monthly on bills for lumber actually furnished and approved by the superintendent or his authorized representative.

The specifications required that the lumber should be delivered by the contractor at such places on the river front, between Peters avenue and Poland streets, as might be designated in the orders of the superintendent or his authorized representative, in such sizes and quantities as might be ordered. And, as to orders for a car load of 10,000 feet, it was stipulated that, in the event of nonshipment within 24 hours after an order was delivered to the contractor or his authorized representative, the superintendent should have the right to order the lumber from other parties and deduct the excess of the cost from the monthly bills of the contractor, a corresponding delay being allowed the contractor to fill orders for larger quantities than one car load. Orders were not to be given for less than a car load of 10,000 feet of lumber; but an order might require the delivery of a car load at several points and impose the expense of switching and hauling

upon the contractor. All lumber delivered was to be unloaded by the contractor at the places of delivery stated in the orders. The contractor was required to keep on hand at all times, ready for delivery, at least 100,000 feet of lumber of the dimensions stated in the specifications. The specifications contained other provisions not pertinent to the issues involved in this case.

The plaintiff, being the lowest bidder, was awarded the contract at the opening of the proposals on the 8th of January, 1913; and, on the 18th of that month, the parties signed a contract submitted by the board. This contract was on a printed form that was intended for contracts for the construction of buildings and other works, and it contains many provisions that are irrelevant to the contract that was entered into by the board's acceptance of the lumber company's proposal or bid.

The plaintiff made shipments of lumber in February, March, and April, for which payments were made promptly on the 10th of each month succeeding the month of delivery, according to the contract. In the meantime, there was a change in the membership of the board of commissioners; and, in May, 1913, one of the new members inspected the wharves and discovered, as he thought, that the lumber inspectors employed by the superintendent had accepted a considerable quantity of lumber that was not up to "B" grade. An investigation followed, and resulted in a proposition being made by the board to the lumber company to have the lumber reinspected, which the lumber company declined. In the meantime, orders for 166,712 feet of lumber, amounting to $3,593.54, were filled in the month of May, for which the board refused to pay on the 10th of June, when the bill was due, at which time the contractor had filled orders in June for 54,170 feet of lumber, amounting to $1,104.74, for which the board also declined to

make payment unless the contractor would consent to a reinspection of the lumber that had been accepted. The board refused to allow the contractor to unload two car loads of lumber which had been set out on the river front, and which the lumber company was finally compelled to remove and dispose of elsewhere. After several meetings and considerable correspondence between the representatives of the lumber company and the board, the contractor formally put the board in default and thereafter instituted this suit to recover $3,593.54 for the lumber delivered in May; $1,104.74 for the lumber delivered in June; $519.40 for expense of storing, belting, and demurrage on 20 cars of lumber which the plaintiff had held at the port and was prevented by the defendant's employés from delivering for inspection; $2,907.12 for loss of profit, at $2.97 per thousand feet, on 978,889 feet of lumber, ordered by the board, but not delivered by plaintiff, on account of the alleged breach of the contract by the defendant board; and $10,248.61 for loss of profit, at $5.97 per thousand feet, on 1,716,702 feet of lumber, estimated as the quantity of lumber which the defendant board would have ordered during the remaining 6½ months if the contract had been carried out, in proportion to the quantity ordered and delivered during the first 5½ months.

In answer to the petition, the defendant alleged that it was justified in refusing to pay for the lumber delivered in May and June, 1913, because the receipt of the lumber was, as defendant alleged, unauthorized, because it was not inspected by the superintendent of the board, nor by his authorized representative. The defendant alleged that the plaintiff had, in bad faith and with a desire to take advantage of the fact that some of the so-called lumber inspectors of the defendant board were incompetent and inexperienced, ordered from the mills in Mississippi a grade of lumber there called "square edge

and sound," including a large proportion of sap and very little "B" grade lumber. The defendant alleged that:

"By faulty and imperfect, incomplete, and erroneous inspections by defendant's inspectors, much of said inferior lumber was passed by said inspectors, which inspection was subsequently not approved as to the May bills of 1913 by the engineer of the board, then acting as superintendent of these lumber deliveries, by special resolution of this board."

The defendant asserted a demand in reconvention for damages in the sum of $5,000 for the expense of maintaining a large force of laborers without a sufficient supply of "B" grade lumber to keep them occupied, and in the sum of $3,000 for the excess cost of the lumber purchased elsewhere after June, 1913, above the prices at which the plaintiff contracted to furnish "B" grade lumber.

Judgment was rendered in favor of the plaintiff for $8,077.75, with legal interest on $3,593.80 from June 10, 1913, on $1,057.33 from July 10, 1913, and on the items of $519.-40 and $2,907.12 from judicial demand. The defendant appealed, and the plaintiff prays that the amount of the judgment be increased $1,982.70, for loss of profit on 332,111 feet of lumber (in addition to the 978,889 feet for which the profit was allowed) purchased by the defendant after June, 1913.

### Opinion.

[1] In ordering the lumber from the mills in Mississippi to fill this contract, the plaintiff did not order "B" grade, but ordered all "square edge and sound" lumber, which, according to the classification recognized there, includes principally "B" grade and some higher and some lower grades, as lumber is classified by the Contractors' & Dealers' Exchange in New Orleans. The rules of inspection and classification of the Contractors' & Dealers' Exchange in New Orleans allow one inch of sap on each edge or two inches of sap on one edge of "B" grade yellow pine lumber. "Square edge and sound" is not

classified by inspecting and grading the lumber after it comes from the saw, but by manipulating the log and cutting for the best results. The sap, which is sawed off until the log is squared, is kiln-dried, exported, and used for interior work, and is worth more than "B" grade lumber. Sap lumber, however, is not durable when exposed to the weather, and was therefore undesirable for the construction or repair of wharves, for which the lumber was ordered under this contract.

The plaintiff's object in shipping all "square edge and sound" lumber direct from the mill, instead of grading it and shipping only the "B" grade to the defendant's wharves in New Orleans, was to avoid unnecessary expense. Handling and grading lumber is such an expensive operation that the plaintiff considered it economical to buy and ship all "square edge and sound" lumber, and dispose of the rejects or culls in New Orleans, where the lumber had to be graded finally by the defendant's inspectors. There was no dishonesty or unfairness in this, because the cost of shipping and unloading and removing the culled lumber was borne by the plaintiff under the terms of the contract. Every piece of lumber was inspected by the defendant's lumber inspectors, as it was unloaded from the cars at the place of delivery; and, as the plaintiff had no voice in the inspection, the defendant received only what its inspectors considered "B" grade or better. It is also admitted in the defendant's answer, and repeated in the brief of the defendant's counsel, that the average price in the plaintiff's bid was $5 below the market price; and the plaintiff acknowledges that it could not have sold "B" grade lumber at such a low price, except for the advantage of buying and shipping all "square edge and sound" lumber direct from the mill and disposing of the culls in New Orleans.

As the lumber was not sold until it was inspected and accepted by the representatives of the defendant board, the shipment of all "square edge and sound" lumber was advantageous to the board, provided its inspectors were honest, careful, and competent. The defendant does not charge that there was any fraud or dishonesty on the part of its inspectors or collusion between them and the plaintiff company. On the contrary, when the defendant offered evidence to prove that some of the lumber that had been accepted was below "B" grade, the plaintiff's counsel objected, on the ground that the defendant had not alleged that the plaintiff was guilty of fraud or collusion; and the plaintiff's counsel then offered to waive any objection to an amendment of the defendant's pleadings in this respect. The pleadings were not amended, and the court sustained the objection to the evidence.

The defendant's right to put an end to this contract by refusing to pay for the lumber that had been accepted by its inspectors depended upon its right to demand a reinspection of the lumber. A reinspection of the lumber that had been accepted by the board would have been very unfair to the plaintiff, who had removed and disposed of the rejected lumber and had had no voice whatever in its rejection. Of the lumber tendered for inspection, there was rejected 10 per cent. in February, 11 per cent. in March, 9 per cent. in April; 11 per cent. in May, and 18 per cent. in June; from which it may be inferred that the inspection was more strict and more favorable to the purchaser after the new member of the board complained. But this does not signify that there was dishonesty going on before the complaint was made. The inspection and grading of lumber is not an exact science. It is usually done by two inspectors, one representing the seller and the other representing the buyer; and they generally "give and take" alternately on what are called "line boards." The result of an inspection of lumber therefore depends large-

ly upon the judgment of the individual who has done the inspecting—his strictness or liberality in construing and applying the rules. In the present case, the seller was entirely at the mercy of the inspectors representing the purchaser. The contract provided:

"All the lumber shall be subject to the approval of the superintendent, who shall be the sole judge of the quality thereof under the specifications, and the measurements;" and "the word 'superintendent' shall mean the general superintendent of the board of commissioners of the port of New Orleans, or his duly authorized representative."

It was not contemplated in the contract that all the lumber should be inspected by the general superintendent personally; the inspectors employed by him were his duly authorized representatives, having authority to approve the grade and accept the lumber.

[2] The plaintiff is not responsible for the fact, if it be a fact, that the board of commissioners employed lumber inspectors who were "incompetent and inexperienced" and made "faulty and imperfect, incomplete, and erroneous inspections."

The defendant's counsel refers to sections XI and XIX of the printed form of the contract, having reference to a contract for the construction of some building or other work, viz.:

"XI. The issuance of any certificate by the engineer or the payment of any moneys to the contractor, whether due under the contract or not, shall not be considered or construed as an acceptance by the purchaser of the work either in whole or in part, and the said work shall remain at the sole risk of the contractor until it is finally completed and accepted in its entirety."

"XIX. Upon the final completion of the work, the engineer shall, with all due diligence, proceed to measure and inspect the work and material furnished by the contractor under this contract, and shall, as soon as possible, tender to the purchaser (furnishing to the contractor a certified copy thereof) a final estimate of the total work and material furnished. The purchaser shall then pay or cause to be paid to the contractor all sums due the said contractor under the terms of this contract, and shall also release the surety."

The foregoing clauses refer to the acceptance of *work*. There was no work to be done, to remain at the risk of the contractor, or to await final completion and acceptance. It was not contended, in the demand for a reinspection, nor is it contended in the defendant's pleadings in this case, that these printed clauses, referring to contracts for work, put the lumber at the risk of the seller after inspection and acceptance. According to the specifications attached to and controlling the printed contract, the lumber became the property of the board and was used as soon as it was inspected and accepted, and it was to be paid for at the end of each month.

[3] The learned counsel for the board of commissioners also refers us to the doctrine that one who deals with a municipal or other political corporation or board must see that the agents of the corporation are acting within the scope of their authority. This is true, but it is also true that municipal corporations and boards are responsible for what their agents do within the scope of their authority, in their contracts with individuals or private corporations. If this were not true, the authority of municipal and other corporations and boards to contract, and sue and be sued, would amount to nothing. On this subject, see N. O., M. & C. R. R. Co. v. City of N. O., 26 La. Ann. 481, quoting Dillon on Municipal Corporations, § 39. See, also, City v. Kerr, 50 La. Ann. 417, 23 South. 384, 69 Am. St. Rep. 442, and authorities cited. In the absence of fraud, deceit, or concealment on the part of the seller of the material, or collusion with the agents of the municipal board that purchased it, the board has no right to refuse to pay for the material, on the allegations merely that its agents who inspected and accepted the material were incompetent and inexperienced, and made faulty, imperfect, incomplete, and erroneous inspections. Hence we conclude that the judgment for $3,593.80, the price of the lum-

ber delivered in May, and for $1,057.33, the price of the lumber sold in June, 1913, is correct, and should be affirmed. We also conclude that the judgment for $519.40, for expense incurred by the plaintiff in storing and handling on the Belt Railroad the 20 car loads of lumber which the plaintiff was prevented from delivering by the defendant's breach of the contract, is correct.

[4] The item of $2,907.13, however, is for the loss of profit which the plaintiff might have made, at $2.97 per thousand feet, on the orders given for 978,889 feet of lumber, which the plaintiff was prevented from delivering by the defendant's breach of the contract. The Civil Code (article 1934), provides that, where the object of a contract is anything but the payment of money, the damages due to the creditor for its breach are the amount of the loss he has sustained and the profit of which he has been deprived. In this case, however, the plaintiff estimates the profit of which he has been deprived, on the lumber which was not delivered, at the same rate of profit that was made on the lumber which was delivered. The defendant's answer is that the profit made on the lumber delivered was made on faulty, imperfect, incomplete, and erroneous inspections, made by incompetent and inexperienced inspectors representing the purchaser. Although the defendant was bound by the inspections and approvals made by the authorized agents of the board, the defendant was not bound to continue their employment. The board of commissioners had a right to discharge its lumber inspectors and employ others. The question whether the inspectors were competent or incompetent, and whether their inspection was correct or incorrect, was deemed irrelevant, and was not decided by the district court. That question, however, is relevant in determining whether the plaintiff should recover, for the loss of profit on the lumber not delivered, at the same rate of profit that was made on the lumber that was delivered according to the inspection complained of. We have concluded that the ends of justice will be better subserved by reserving the plaintiff's right of action for damages for the alleged loss of profits on the lumber not delivered, and affirming the judgment in other respects, than by remanding the case.

It is ordered and decreed that the judgment appealed from be amended, by rejecting the item of $2,907.13, for alleged loss of profits on lumber not delivered, reserving the plaintiff's right of action for damages for whatever loss of profits may have been sustained, and in all other respects the judgment appealed from is affirmed; the appellee to pay the cost of appeal.