## GIANFORTONE v. CITY OF NEW ORLEANS.

(Circuit Court, E. D. Louisiana. April 7, 1894.)

No. 12,074.

1. MUNICIPAL CORPORATIONS—WRONGFUL DEATH—MOBS.

A statute making municipal corporations liable for the destruction of "property" by mobs (Rev. St. La. § 2453) does not include liability for taking of life.

2. SAME—CONSTRUCTION OF STATUTE.

The Louisiana statute providing that "every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it," and further expressly giving an action for wrongfully causing death (Civ. Code, art. 2315), does not render the city of New Orleans liable to a wife for the killing of her husband, while in prison, by a mob, through the negligence and inefficiency of the police; for liability of a municipal corporation in respect to negligence of its officers or agents in the exercise of its governmental, as distinguished from its private, powers, is not to be inferred from any doubtful language.

Action by Giuseppa Gianfortone, widow of Pietro Monasterio, and as tutrix of her minor children, to recover damages against the city

of New Orleans for permitting the killing of her husband by a mob. Heard on exception of no cause of action.

Henry Chiapella and Sambola & Dueros, for plaintiff.

E. A. O'Sullivan, City Atty., for defendant.

PARLANGE, District Judge.　This is a suit in damages against the city of New Orleans, brought by Giuseppa Gianfortone, widow of Pietro Monasterio, on her own behalf and as natural tutrix of her minor children, issue of her marriage with said Monasterio. The petition alleges that Monasterio, together with other persons, was arrested on the charge of having murdered the chief of police of New Orleans; that he was prosecuted, together with said other persons, for said crime, before the criminal district court for the parish of Orleans,—the trial resulting in a mistrial as to Monasterio and two of his coaccused, and in a verdict of acquittal as to six of his coaccused; that immediately after said verdict, a conspiracy was formed by a certain body of men, unknown to the petitioner, with the avowed purpose of setting at naught the findings of the jury in the criminal district court, and with the sole purpose of taking the law into their own hands, and of summarily, and without trial, destroying, by wholesale slaughter, the lives of Monasterio and his coaccused, all of whom were then incarcerated in the parish prison; that, in pursuance of said conspiracy, a mass meeting was called for the next day at Clay statue, on the main street of the city, which assembly was advertised in the morning newspapers of the city; that in answer to said call a crowd congregated at said place, where inflammatory speeches were made, and that, after the passions of the mob had been aroused, it moved in a body to the parish prison; that some 40 or 50 armed men, whose names are unknown to the petitioner, preceded the main body of rioters, and secured admission inside the walls of the prison by breaking open a rear door of the building, meeting with no resistance from the police authorities; that said armed body took possession of the prison, and shot down and killed Monasterio and 10 of his coaccused.

The petition further avers that if the mayor and chief of police of the city, upon reading in the newspapers the advertisement of the proposed mass meeting, had taken the proper steps for the protection by the police of the parish prison, as well as the lives of the prisoners, the riotous assemblage would not have organized, nor have proceeded to the parish prison, nor have taken the same, and the slaughter would have been prevented; that the parish prison is a massive building, easy to defend by a handful of disciplined policemen, for a time, at least, and until the militia of the state, or other police assistance, could have been summoned; that, from the place where the mass meeting was held, to the parish prison, no police officers were stationed, with instructions to arrest the march of the mob; that the police force at the parish prison was insufficient, imperfectly armed, and demoralized, and yielded easily to the mob; that the safety of the prisoners might have been provided for by their prompt removal to another prison; that the mayor was not in his

office that morning, and could not be found, and that he gave no instructions to the police to disperse the mob; that the mayor is the chief magistrate and chief executive of the city, is at the head of the police force, and is charged with the duty of seeing the laws executed, and of preserving peace and good order within its limits; that the chief of police, next in command to the mayor, was equally derelict in his duties, and was, together with the mayor, and all of the employes, agents, deputies, and subordinates, guilty of gross carelessness and culpable negligence; and that by reason thereof, and of their failure to perform the duties of their respective offices, the city of New Orleans is liable in damages to the petitioner in the sum of $10,000, on a cause of action which had accrued to said Monasterio, and which has survived his death, and become vested in petitioner, individually and as mother and tutrix.

Act No. 51 of 1855 (now section 2453, Rev. St. La.) provides that "the different municipal corporations in this state shall be liable for damages done to property by mobs or riotous assemblages in their respective limits." Anterior to the enactment of this statute, there was no liability, under the law of Louisiana, on the part of municipal corporations, for the destruction of property by mobs. In 1855 a similar statute was enacted in the state of New York, and as late as the year 1865, a vigorous attack was made upon its constitutionality, but its validity was sustained by the court of appeals of that state. See Darlington v. Mayor, 31 N. Y. 164. This case is of much value and interest, as setting forth the history of the legislation by which municipal corporations are made liable for the destruction of property by mobs. Judge Dillon, in his work on Municipal Corporations (volume 2, § 959), says: "Public or municipal corporations are under no common-law liability to pay for the property of individuals destroyed by mobs or riotous assemblages, but in such case the legislature may constitutionally give a remedy." [Numerous cases cited.]

"At common law * * * a municipal corporation is not liable for the destruction of property by a riotous assemblage of persons, or for the neglect of its officers in not preserving the peace, and preventing such destruction. But this doctrine is not in accordance with sound public policy, and has been changed by statute in many of the states. * * * But the right to demand reimbursement from a municipal corporation for damages caused by a mob is not founded on contract. It is a statutory right, and may be given or taken away at pleasure." [Numerous cases cited.] 15 Am. & Eng. Enc. Law, verbis "Municipal Corporations," p. 1158.

It is therefore clear that, in the absence of a statute, municipal corporations are not liable for the destruction of property by mobs, and I have stated that as late as 1865 the constitutionality of such a statute was contested. Even now, in a number of states, there are no statutes imposing the liability upon municipal corporations.

Act No. 51 of 1855 cannot be construed so as to include within its purview loss of life caused by a mob. It was not until the enactment of Act No. 71 of 1884 that an action could be maintained in this state for damages caused by the death of a human being. See

Vredenburg Case, 33 La. Ann. 627; Van Amburg Case, 37 La. Ann. 651. As, prior to 1855, municipal corporations were not liable for any acts of violence committed by a mob, it is beyond question that, when the legislature enacted Act No. 51 of 1855,—our jurisprudence then being that no damages could be had for the loss of a human life, —it was not contemplated that such an action as this one could be maintained under that statute. By no possible intendment could "property," in 1855, have been made to include a human life. As, neither by the common law nor by the civil law, could the price of a human life be sued for, and as it has been shown that there is no implied liability on the part of municipal corporations for any acts of violence committed by mobs, it is perfectly clear that if the legislature, in 1855, had intended to innovate in both respects, it would have done so clearly. It is also evident that Act No. 51 of 1855 does not provide for terror, or other injuries to feelings, caused by mobs. That act being the only statute of Louisiana mentioning municipal corporations by name with regard to torts, if the city of New Orleans can be held liable in this action, it must be by force of some other law. I understand that all claim that this action is based on the act of 1855 is abandoned, but it is urged that the city of New Orleans may be held liable under article 2315, Civ. Code La., as amended by Act 71 of 1884, which article now reads:

"Every act, whatever, of man that causes damage to another obliges him by whose fault it happened to repair it; the right of this action shall survive in case of death in favor of the minor children or widow of the deceased, or either of them, and in default of these, in favor of the surviving father and mother, or either of them, for the space of one year from the death. The survivors above mentioned may also recover the damages sustained by them by the death of the parent or child, or husband, or wife, as the case may be."

In support of the view that the city is liable in the present action under article 2315, Civ. Code, the plaintiff cites cases which she contends were decided against the city by virtue of that article of the Code. The particular cases cited may have been decided under article 2315 of the Civil Code, or they may have been based upon the implied liability of municipal corporations. However this may be, those cases bear but incidentally on the matters in hand.

The solution of the question presented in this case is free from difficulty, and results from making a clear distinction between those powers and duties of the city of New Orleans which are private, and those which are public or governmental. It must be borne in mind that the city of New Orleans is not sued in this action for any commission or omission by it in its corporate capacity. It is being sued for the neglect of duties of its officers.

"So far as municipal corporations of any class, and however incorporated, exercise powers conferred on them for purposes essentially public,—purposes pertaining to the administration of general laws made to enforce the general policy of the state,—they should be deemed agencies of the state, and not subject to be sued for any act or omission occurring while in the exercise of such power, unless by statute the action be given. In reference to such matters, they should stand as does sovereignty, whose agents they are,—subject to be sued only when the state, by statute, declares they may be. In so far, however, as they exercise powers not of this character, voluntarily assumed,— powers intended for the private advantage and benefit of the locality and its inhabitants,—there seems to be no sufficient reason why they should

be relieved from that liability to suit and measure of actual damages to which an individual or private corporation exercising the same powers, for purposes essentially private, would be liable." 15 Am. & Eng. Enc. Law, verbis "Municipal Corporations," p. 1141, and cases there cited.

"Neither the federal nor the state governments are liable for the unauthorized torts of their officers, and municipal corporations are entitled to the same exemptions when they act in a governmental or political capacity. But when the tort is committed in the performance of some municipal or corporate duty, which is private in its nature, the corporation is liable." 19 Am. & Eng. Enc. Law, verbis "Public Officers," p. 514, and cases there cited.

Field, in his work on the Law of Damages (page 33, § 37), says:

"The true doctrine is that the powers conferred in the sections we have been considering are of a legislative and governmental nature, for a defective execution of which the city cannot be held liable. In discharging these legislative functions, the city acts as a quasi sovereign, and is not responsible for a neglect or nonperformance of its officials or agents."

Citations from authoritative text writers to the same effect as the citations just made could be multiplied.

Nearly 40 years ago, in the case of Stewart v. New Orleans, 9 La. Ann. 461, the supreme court of Louisiana distinctly recognized the doctrine that a municipal corporation, in the exercise of power which it possesses for public purposes, and which it holds as part of the country, enjoys the exemption of government from responsibility for its own acts, and for the acts of its officers deriving their authority from the sovereign power. The suit was against the city of New Orleans for the value of a slave wrongfully and unjustifiably killed by the police of the city, in a police raid ordered by the chief of police. The supreme court, in reversing the judgment against the city rendered by the lower court, said:

"The judgment we think erroneous, and the error results from a failure * * * to make the proper distinction between the liability of a municipal corporation for acts of its officers in the exercise of powers which it possesses for public purposes, and which it holds as part of the government of the country, and those which are conferred upon it for private purposes. Within the sphere of the former, it enjoys the exemption of government from responsibility for its own acts, and the acts of its officers deriving their authority from the sovereign power [citing authorities], whereas in the latter it is answerable for the acts of those who are, in law, its agents [citing authorities]. * * * The inquiry which is next presented is whether the powers under which the officers of the municipality acted were conferred for public purposes. If so, it follows that the city is not liable for the acts of its officers, even though illegal, or of such a character as to subject the officers themselves to liability. The act of 1805, incorporating the city of New Orleans, provides for the appointment of a mayor, recorder, and aldermen, and such subordinate officers 'for preserving the peace and well ordering the affairs of the city, as the council shall direct.' Through all the changes of city government, this power has been continued, and the conclusion, therefore, that these powers are governmental, is strengthened by the fact that the constitutions of 1845 and 1852 both provide that 'the citizens of the city of New Orleans shall have the right of appointing the several public officers necessary for the administration of the police of said city, pursuant to the modes of election which shall be provided by the legislature. * * *' (Article 128.) So that the right of regulating the police of the city of New Orleans does not rest alone upon legislative permission, but is authorized by the constitution itself. Under these sanctions, watchmen are appointed as a necessary branch of the police of the city. *Their duties are the preservation of public order and tranquility, and the city, in appointing them, exercised a governmental function, con-*

*ferred upon it, in its public or municipal character, for public purposes, exclusively, and is not, therefore, liable for the acts of its officers."* (Underlining mine.)

It is to be specially noted that article 128 of the constitution of 1845, just cited, or its equivalent, has existed in all the constitutions of this state, except that of 1868. State v. City of New Orleans, 41 La. Ann. 173, 6 South. 592. The present constitution and the city charter of 1882 both recognize the city of New Orleans as one of the political divisions of the state, and as one of the arms of sovereignty for governmental purposes. In the case of Egerton v. Third Municipality of New Orleans, 1 La. Ann. 437, decided in 1846, the supreme court of Louisiana said:

"It is a remarkable fact * * * that the people of Louisiana, in convention assembled, have twice considered the local government of this great metropolis as too important to be placed among those subordinate institutions, and have recognized the city of New Orleans, in its corporate capacity, as entitled to peculiar political powers and privileges. The right of the citizens of the city of New Orleans to appoint the several public officers necessary for the administration of the police of said city, * * * and the right of the officers thus appointed to be commissioned as justices of the peace, and to exercise such criminal jurisdiction for the punishment of minor crimes as the legislature may vest in them, are secured and rendered permanent by article 128 of the state constitution. Those political franchises stand upon the same ground as any other constitutional power, *and the city of New Orleans and its officers are, for purposes of police and good order, and for the punishment of minor crimes and offenses, permanent functionaries of the government.*" (Underlining mine.)

This decision was rendered under the regime of the constitution of 1845, and the recognition of the local government of the city of New Orleans in the constitutions of 1812 and of 1845, which the supreme court said was "a remarkable fact," has since then been emphasized by further recognition in the constitutions of 1852 and 1879.

The Stewart Case, above cited, was affirmed, and its doctrine declared conclusive, in the case of Lewis v. New Orleans, 12 La. Ann. 190, which was a suit against the city of New Orleans for the value of a slave incarcerated in the parish prison by order of his master, the city deriving a pecuniary profit by receiving from the master a per diem compensation for keeping the slave incarcerated. The slave having fallen sick, and the master not being notified, the action was brought to recover the slave's value from the city, because of the gross negligence of the jailer, the agent of the city. It will be noticed that the legal aspects of the Lewis Case are almost identical with the present case. The supreme court held:

"The power of the corporation to erect a police jail, to employ officers to superintend it, and to pass ordinances for its government, *is, in effect, a power granted for public purposes,* and not private benefit or advantage. * * * According to the principle announced in Stewart v. New Orleans, 9 La. Ann. 461, and which we consider conclusive upon the subject, the *city cannot be held liable in the present case for the nonfeasance or misfeasance of the officers of the police jail.*" (Underlining mine.)

The doctrine of the Stewart Case was again affirmed in Bennett v. New Orleans, 14 La. Ann. 120. The court said:

"It seems to be a well-settled principle in respect to the jurisdiction of courts that the sovereign cannot be sued without his consent. * * * This exemption from liability on the part of the government has been extended to municipal corporations vested with, and exercising portions of, the sovereign power,

.for the reason that such corporations are considered the representatives of the government, and that their exemption from suit is necessary to make the prerogative available to the government itself;" citing Stewart Case and other cases.

In the case of Howe v. New Orleans, 12 La. Ann. 482, the supreme court of Louisiana said:

"The city is no general warrantor against the acts of individuals. * ' * * Its police may be applied to for the purpose of preventing injuries, *but if such police err in their judgment, or if injuries are occasioned because they are inefficient in the exercise of the powers with which they are vested, the city at large cannot be held responsible for acts of third persons, which, under a more sagacious and efficient police, might possibly have been prevented.*" (Underlining mine.)

In the case of New Orleans, M. & C. R. Co. v. New Orleans, 26 La. Ann. 478, the supreme court of Louisiana again recognized the doctrine that a municipal corporation possesses two classes of rights, —public and private. In all that relates to the one class, it is merely the agent of the state, and subject to its control,—and that, as to the other class, it is the agent of the inhabitants of the place,— the corporators. The court adopted the language of Judge Dillon, to the effect that municipal corporations possess a double character, —the one, governmental, legislative, or public; the other, in a sense, proprietary or private,—and that the distinction, though sometimes difficult to trace, is highly important, and is frequently referred to, particularly in the cases relating to the implied or common-law liability of municipal corporations for the negligence of their servants, agents, and officers in the execution of corporate duties and powers.

The distinction, which is fully recognized by the supreme court of Louisiana, between the public and the private powers and obligations of municipal corporations, has been just as fully recognized by the highest courts of many of the states. I refer only to a few of the many cases which state the distinction.

The case of Western College v. City of Cleveland, 12 Ohio St. 377, was an action against the city of Cleveland for damages caused to property by a mob. There being no statute in Ohio similar to the Louisiana Act No. 51 of 1855, it was attempted to hold the city of Cleveland responsible by reason of its city charter, which provided that:

"*It shall be the duty* of the city council *to regulate the police of the city, preserve the peace, prevent disturbances* and disorderly assemblages." (Underlining mine.)

The supreme court of Ohio held that the duty intended was that properly appertaining to an administrative and legislative body acting in the government of a city,—the making regulations, by-laws, and ordinances for the purposes specified, to be enforced by the appointment of officers,—and that neither on general principles, nor from the effect of that enactment, was the city of Cleveland responsible for the destruction of property by a riotous assemblage, or for the neglect of the officers in not preserving the peace, and preventing such destruction. The court said:

"It is the duty of the state government to secure to the citizens of the state the peaceful enjoyment of their property, and its protection from wrongful and violent acts. For the proper discharge of this duty, power is delegated in different modes. One of these is the establishment of municipal corporations. Powers and privileges are also conferred upon municipal corporations to be ex-

ercised for the benefit of the individuals of whom such corporations are composed, and, in connection with these powers and privileges, duties are sometimes specifically imposed. It is obvious that there is a distinction between those powers delegated to municipal corporations to preserve the peace, and protect persons and property, whether to be exercised by legislation or the appointment of proper officers, and those powers and privileges which are to be exercised for the improvement of the territory comprised within the limits of the corporation, and its adaptation to the purposes of residence and business. As to the first, the municipal corporation represents the state,—discharging duties incumbent on the state. As to the second, the municipal corporation represents the pecuniary and proprietary interests of individuals. As to the first, responsibility for acts done or omitted is governed by the same rule of responsibility which applies to like delegations of power. As to the second, the rules which govern the responsibility of individuals are properly applicable."

A demurrer to the petition was sustained.

The case of Ulrich v. City of St. Louis, 20 S. W. 467, decided by the supreme court of Missouri, was an action in which the plaintiff alleged that, while incarcerated in the workhouse of St. Louis, he was disabled for life by the negligence of the jailer. A general demurrer having been filed to the petition, the demurrer was sustained by the lower court, and the cause dismissed. The action of the lower court was sustained by the supreme court. In the course of its decision the court said:

"The rule of law is well settled in this state that a municipal corporation is not answerable in damages for the negligent acts of its officers in the execution of such powers as are conferred on the corporation for the public good;" citing cases.

The court cited approvingly the language of Judge Dillon, as follows:

"The police regulations of a city are not made and enforced in the interest of the city, in its corporate capacity, but in the interest of the public;" citing numerous cases.

In the case of Rusher v. City of Dallas, 18 S. W. 333, decided by the supreme court of Texas, it was held that a complaint, in a suit against a city, which alleges the arrest of the plaintiff by a city policeman for a supposed violation of a city ordinance, of which violation he was in fact innocent; that the arrest was made without a warrant or an affidavit; that unnecessary violence was used by the policeman; and that the policeman was incompetent, to the knowledge of the city,—states no cause of action. The court said, inter alia:

"A distinction is made where the act is done in promotion of the interest of the city, in its special corporate rights, and when done in the interest of the public. Where a city has special powers granted by charter, other than those concerning the public good and government of its citizens, so that its officers' acts thereunder are the acts of agents, and not of public officers, the city may become liable; but not where the act is that of an officer in enforcing ordinances of social government, or a general law of the land."

In Whitfield v. City of Paris, 19 S. W. 566, decided by the supreme court of Texas, where a policeman appointed by the city to kill dogs, negligently and recklessly discharged his gun at a dog, and seriously injured the plaintiff, a demurrer to the petition was sustained, and the action of the lower court affirmed by the supreme court. The court said:

"The enactment of the ordinance referred to in the petition [an ordinance directing the killing of dogs by a policeman] was an exercise by the city of its police power. Its purpose was to secure the safety, health, and welfare of the public. The man whose act was complained of was not, therefore, a mere servant or employe, though the petition so denominates him. He occupied the attitude of a policeman engaged in the enforcement of an ordinance of the city. In such a case the maxim, 'respondeat superior,' does not apply. Where a city acts as the agent of the state, it becomes the representative of sovereignty. It is not acting in the management of its private or corporate concerns, but in the interest of the public, and as the guardian of the health, peace, convenience, and welfare of the public. Under such circumstances, it is not liable for the acts of its officers or employes engaged in the execution of its ordinances;" citing numerous cases.

In the case of O'Rourke v. City of Sioux Falls (S. D.) 54 N. W. 1044, a demurrer was sustained to a complaint setting out that plaintiff had suffered great personal injuries by the firing of a cannon in the streets of the city in violation of a city ordinance. The complaint alleged that the city had appointed and continued in office a careless, inefficient, and negligent police force; that, with the full knowledge on the part of the members of the common council that it was to be done, the police officers permitted said cannon to be fired in the street after dark, and at a time when it could not be discovered by travelers on the street. The court said:

"There are two kinds of duties imposed upon a municipal corporation, in respect to which there is a clear distinction: One is imposed for governmental purposes, and is discharged in the interest of the public; and the other arises from the grant of some special power, in the exercise of which the municipality acts as a legal individual. In the latter case, the power is not held or exercised by the municipality as or because it is one of the political subdivisions of the state, and for public governmental purposes, but as and because it is, as an individual might be, the grantee of such power for private purposes. In such case the municipality is on the same footing with a private grantee of the same power, and is, like him, liable for an injury caused by the improper use of such power. But where the power is conferred upon the municipality as one of the political divisions of the state, and conferred, not for any benefit to result therefrom to such municipality, but as a means in the exercise of the sovereign power for the benefit of the public, *the corporation is not answerable for nonfeasance or malfeasance by its public agents.*" Cases cited. (Underlining mine.)

Similarly, it has been held that a city is not responsible for the destruction of a building to stop the spread of fire (Correas v. San Francisco, 1 Cal. 452); that the city of New Orleans was not liable for the neglect of firemen in not extinguishing fires (Yule v. New Orleans, 25 La. Ann. 394); that a municipality is not responsible for neglecting to take precautions to prevent the spread of smallpox (Iowa Case; Field, Dam. p. 33, § 37). The cases cited are but a few of the adjudications on the subject, but they are amply sufficient to show that the distinction between the public and private duties and powers of municipal corporations is well established throughout the country.

But four cases have come under my observation in which actions have been brought against municipalities for loss of human life: Ritz v. City of Austin, 20 S. W. 1029–1031, in which the court of civil appeals of Texas held that a Texas statute which allows actual damages for the death of any person through the wrongful act, neglect, or default of "another" allows recovery only against natural

persons, and not against corporations; City of Atchison v. Twine, 9 Kan. 356; Dale Co. v. Gunter, 46 Ala. 118; and Luke v. Calhoun Co., 52 Ala. 115. The three cases last cited were brought under special statutes distinctly giving a right of action against a municipality or county for loss of life at the hands of a mob.

It is true, as Judge Dillon remarks, that it is sometimes difficult to determine whether a particular case comes under the operation of the governmental, or of the private, powers and duties of a municipal corporation. The difficulty naturally increases as particular cases approach nearer to the line which divides the two sets of powers and obligations. But the instant case presents no difficulty in that respect. It seems to me that it would be impossible to state an instance of public or governmental duty and power which would be plainer or more obvious than that which the instant case presents. I am perfectly clear that the duty, the nonperformance of which is here complained of, was a duty of sovereignty, transferred by the sovereign to the city of New Orleans, and that in its performance the city was merely the representative of the sovereign. I am equally clear that in the exercise of this governmental power the city officers, quoad their acts under that power, are virtually state functionaries, acting for and on behalf of the state. In my judgment, the same exemption as to liability exists in this case in favor of the city as would exist in favor of the state, if state officers, by the nonperformance of duty prescribed by a state law appertaining to the governmental powers and duties of the state, had been guilty of the nonfeasance here complained of.

It may be that there are cases of extreme hardship where no redress can be had because of the malfeasance or nonfeasance of the officers of a municipality in the exercise of its governmental powers. The law of Canute the Dane making the vills responsible for the homicides committed within their limits, and King Alfred's law making the inhabitants of the tithings free pledges to the king for all offenses committed in their districts, may have been wise laws. It may be that every one should have an interest in preventing violence, and maintaining the public peace. But these are considerations which address themselves exclusively to the lawmaker. The courts cannot legislate. They can but apply the law as they find it.

To summarize my conclusions:

1. Act No. 51 of 1855, providing that municipal corporations shall be liable for the destruction of "property" by mobs, does not sustain an action for the taking of human life.

2. The obligations of the city of New Orleans are of two kinds: The first consists of public or governmental duties; the second, of private or proprietary duties. As to the former the city is the representative of the sovereign, and enjoys the exemption of sovereignty from liability to suit. As to the latter, the city may be sued for tort, or on contract, as a private corporation might be sued.

3. The duty of the city, upon the nonperformance of which this action is founded, is a public, governmental duty.

Therefore, the exception of no cause of action must be sustained, and the cause dismissed.