### CITY OF NEW ORLEANS v. ABBAGNATO.

(Circuit Court of Appeals, Fifth Circuit. May 29, 1894.)

No. 227.

1. MUNICIPAL CORPORATIONS—LIABILITY FOR DAMAGES FOR DEATH BY ACT OF MOB.

In the absence of a statute giving a remedy, a city is not liable for damages for the taking of human life by a mob, although its officers may have been negligent in preserving the public peace.

2. SAME—CIV. CODE LA. ART. 2315.

Civ. Code La. art. 2315, declaring that "every act whatever of man that causes damage to another obliges him by whose fault it happened to repair

it," which, by subsequent amendments, is made applicable to cases of death through negligence, and is extended to damages sustained therefrom by surviving relatives of the deceased, when construed with regard to the principles of the system of laws of which it is part, gives no remedy for such damages against a municipal corporation for negligence in preserving the public peace, resulting in loss of life by acts of a mob.

In Error to the Circuit Court of the United States for the Eastern District of Louisiana.

This was an action by the widow of Antonio Abbagnato against the city of New Orleans for damages for the death of said Abbagnato. At the trial, the jury found for plaintiff, and judgment for plaintiff was entered on the verdict. Defendant brought error.

This action was commenced in the circuit court by petition as follows:

"The petition of Widow Giovanni Abbagnato, an alien, and subject of the king of Italy, domiciliated at Palermo, Sicily, kingdom of Italy, herein appearing and prosecuting in her own behalf and in her own right, respectfully represents that the city of New Orleans, a municipal corporation, chartered and organized under the laws of the state of Louisiana, and a citizen thereof, and domiciliated within the jurisdiction of this honorable court, is justly and truly indebted unto your petitioner in —— capacity, hereinabove recited, in the full sum of thirty thousand dollars ($30,000) damages, for the following right and cause of action, which arose on March 14, 1891, in the city of New Orleans, state of Louisiana, and within the jurisdiction of this honorable court, viz.: That Antonio Abbagnato (Bagnetto), an alien, and a subject by birth of the king of Italy, domiciliated at Palermo, Sicily, kingdom of Italy, emigrated therefrom to the United States on or about the year 1884, and that he came to Louisiana, and established his residence in the city of New Orleans. That, while here residing, he was arrested on or about October, 1890, together with twenty or more other persons, on a charge of murder of the chief of police of said city, D. C. Hennessy, which had recently occurred; was prosecuted with said other persons for said crime before the criminal district court for the parish of Orleans, when, after a protracted trial, lasting —— days, and after evidence adduced, argument of counsel, and charge of the presiding judge, the jury, on March 13, 1891, returned into court and pronounced a verdict of acquittal as to said Antonio Abbagnato (Bagnetto), and five other coaccused, and of mistrial as to three other coaccused. That, immediately after said trial and verdict, the said Antonio Abbagnato (Bagnetto), and the other coaccused, including such who had been acquitted and such as to whom there had been a mistrial, were, pending further legal proceedings, reincarcerated in the parish prison, which is the property of the city of New Orleans. That during the evening and night of March 13, 1891, and immediately after the verdict of the jury had become known throughout said city of New Orleans, a conspiracy was formed by a certain body of men, whose names are now to your petitioner unknown, with the avowed purpose of setting at naught the findings of said jury and the legal and regular methods of criminal trial and justice, as established and recognized in civilized communities throughout the world, and which had heretofore prevailed in the present community, and with the sole purpose of taking the law unto their own hands, and of summarily, and without the formalities of trial and criminal justice, destroying, by wholesale slaughter, the lives of the said Antonio Abbagnato (Bagnetto) and the other twenty or more coaccused, then incarcerated with him in said parish prison. That, in pursuance of said conspiracy and plan of action, a mass meeting was called for the next day at 10 a. m., at Clay statue, on the main street of the town, at about three-quarters of a mile from the parish prison, which said assembly was extensively advertised in the morning papers of the city, as appears by a copy of the New Orleans Times-Democrat of said date, which is annexed hereto for reference. That, in accordance with said call, a crowd congregated at said place, where several inflammatory speeches were made, as appears from the issue of the New Orleans Daily States, a newspaper of said city, dated March 14, 1891, which is hereto annexed for reference. That, after their passions had been so aroused, the mob

moved in a body from the place of meeting to the parish prison, which they surrounded on all of its four sides, cutting off all avenues of escape therefrom. That some forty or fifty men out of said mob, whose names are now to your petitioner unknown, armed with Winchester rifles, shotguns, revolvers, axes, crowbars, and other weapons, and who preceded the main body of the rioters, secured admission inside the walls of the prison by breaking open a rear door of the building, meeting with little or no resistance from the police authorities and other persons who should have been charged with the duty of protecting the avenues to said parish jail. That the said armed body of men took absolute possession of the building, and during 15 or 20 minutes, with said Winchester rifles, shotguns, pistols, axes, and other deadly weapons, began an immediate search, hunt, and slaughter of their intended victims, who were unarmed, and were mercilessly shot down and killed, including the said Antonio Abbagnato (Bagnetto) and ten other prisoners, two of whom, viz. the said Antonio Abbagnato (Bagnetto) and Emanuele Polizzi (Manuel Polizzi), were taken out of the jail into the street, and were hanged by the neck to trees or lamp posts, fronting said prison, and then riddled with bullets until death; the names of all the victims and the particulars of their horrible deaths being fully detailed in the issue of the New Orleans Picayune of March 15, 1891, which is hereunto annexed for reference. Now, your petitioner avers that, throughout all of the stages of this bloody drama, no proper steps, means, or action were taken by the authorities having charge of the police, peace, and good order of the city to suppress and defeat said conspiracy, although the mayor of the city of New Orleans, the chief of police, and their employés, agents, deputies, and subordinates knew (as your petitioner is informed and verily believes), since the evening of March 13, 1891, or since early morning on March 14, 1891, that such a conspiracy existed, what its sanguinary programme was, and the time, place, and mode of executing the same. Your petitioner further avers that if the mayor of the city of New Orleans, Joseph A. Shakespeare, and if the acting chief of police, John Journee, on hearing the rumors circulating throughout the city, or on reading in the morning papers of the proposed mass meeting, and understanding its dreadful purpose, had taken the proper steps of police and protection of said parish prison, as well as of the persons and lives of the prisoners which the law of the state had confided to the honor and justice of the city, the said riotous assemblage would never have organized, or would not have proceeded down the streets, or taken possession of the prison building, and the wholesale slaughter would have been prevented. That said parish prison is a massive brick build'ng, with iron doors and railings, easy to defend by a handful of disciplined policemen, for a time at least, and until the militia of the state or other police assistance from the outside could have been summoned. That from Clay statue to the parish prison, a distance of almost a mile, no police officers or other guardians of the peace were stationed, with instructions to arrest the march of the mob coming down the street towards the prison. That the police force at the prison proper, in front of the building itself, and in the interior thereof, was insufficient in number, was not armed, or imperfectly armed, was demoralized, was improperly led and commanded, and readily yielded to the fury of the mob. That the safety of the prisoners might have been provided for by the prompt removal to another prison, police jail, or other place of refuge. That the mayor of the city was not that morning at his office at the city hall, and could not be found, and that he gave no instructions to the police authorities to disperse the mob, and to prevent the consummation of its bloodthirsty designs. That the mayor of New Orleans is the chief magistrate and executive officer of the city; is at the head of the police force, by virtue of his office; and is charged with the duty of seeing the laws executed, and of preserving the peace and good order within its limits. That the chief of police, next in command to the mayor, was equally derelict in his duties, and was, together with the said mayor and all of the employés, agents, deputies, and subordinates, guilty of gross carelessness and culpable negligence. That, by reason of said gross carelessness and culpable negligence on the part of the said mayor of the city of New Orleans and the chief of police and the other subordinate officers of the police force, by reason of their inaction, supineness, and failure to perform the duties of their respective offices in regard to the

proper police of the city, as hereinabove fully recited, and by reason of other acts of omission and guilty indifference, to be shown at the trial of the case, the said city of New Orleans has become liable in damages to your petitioner in her hereinafter mentioned capacity, by reason of a right and cause of action which had accrued to the said Antonio Abbagnato (Bagnetto), and which has survived his death, and become vested in your petitioner, as aforesaid. Your petitioner further represents that the said damages consist of the following items, viz.:

(1) The well-grounded terror and anxiety of mind under which the victim labored prior to the onslaught, which are fully worth the sum of five thousand dollars.............................. $ 5,000

(2) The great mental and bodily pain, suffering, and agony which preceded or accompanied his death, which are fully worth the sum of five thousand dollars...................................... 5,000

(3) The earnings and savings which the said decedent, who was a healthy, strong, and able-bodied young man, might have realized during his natural life, had not the same been prematurely cut off, which are fully worth the sum of ten thousand dollars.......... 10,000

(4) Exemplary and punitive damages for the failure of the city of New Orleans to secure and guaranty to said deceased the protection of life and person to which he was entitled under the federal and state constitutions and general laws of the country, as well as under the special provisions of the treaty entered into between the kingdom of Italy and the United States of America on February 26, 18—, and ratified at Washington on November 17, 1871, which are fully worth the sum of ten thousand dollars.. 10,000

    Total ...............................................$30,000

"Your petitioner further represents that the said Antonio Abbagnato (Bagnetto) was her son, and that he was unmarried and had no children at the time of his death, and that, in default of such wife and children, your petitioner, as surviving mother, has acquired the right of action for the aforesaid damages which has survived the death of the said Antonio Abbagnato (Bagnetto). Wherefore your petitioner prays that the city of New Orleans, through Joseph A. Shakespeare, its mayor, be cited to appear and answer this petition, and that, after due proceedings had, there be judgment in favor of your petitioner in her aforesaid capacity, and against the said city of New Orleans, for the sum of thirty thousand ($30,000) dollars, with legal interest from the date of the verdict of the jury and of the judgment of court, and for all costs of suit, and for all general and equitable relief needful herein."

Citation having issued, the city of New Orleans first appeared, and objected to the form of the citation, and, on that objection being overruled, filed a peremptory exception, as follows: "Now, into this honorable court comes the city of New Orleans, the defendant herein, who files this peremptory exception to the demand of the plaintiff herein, to wit: That municipal corporations of this state are not liable for any other damages done by mobs or riotous assemblages, except to damages done to property. Defendant prays that this exception be maintained, and the said plaintiff's petition dismissed." The exceptions being overruled, the city filed an answer, excepting to the jurisdiction of the court, alleging that the said Antonio Abbagnato was an American citizen of the state of Louisiana, legally naturalized, which exception was also overruled. Thereupon such proceedings were had that a jury was impaneled, the cause tried, and a verdict rendered against the city of New Orleans for the sum of $5,000. Judgment was entered on the verdict, and the city of New Orleans brought the case to this court for review, assigning as error the one ground "that the court erred in overruling the exception herein filed, wherein defendant excepted to the plaintiff's petition, on the ground that municipal corporations of this state are not liable for any other damages done by mobs or riotous assemblages except for damages done to property."

E. A. O'Sullivan, for plaintiff in error.

Henry Chiapella, Sambola & Ducros, and A. H. Leonard, for defendant in error.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

PARDEE, Circuit Judge (after stating the facts). The treaty between the kingdom of Italy and the United States proclaimed November 23, 1871, guaranties to the citizens of either nation in the territory of the other "the most constant protection and security for their persons and property," and further provides that "they shall enjoy in this respect the same rights and privileges as are or shall be granted to the natives on their submitting themselves to the conditions imposed upon the natives." Treaty of 1871, art. 3 (17 Stat. 845). This treaty applies to this case only so far as to require that the rights of the plaintiff shall be adjudicated and determined exactly the same as if she were, and her deceased son had been, a native citizen of the United States.

The constitution of the state of Louisiana provides as follows:

"The citizens of the city of New Orleans or any political corporation which may be created within its limits shall have the right of appointing the several public officers necessary for the administration of the police of said city, and pursuant to the mode of election which shall be provided by the general assembly." Const. La. 1879, art. 253.

"The maintenance and support of persons confined in the parish of Orleans upon charges or conviction for criminal offenses shall be under the control of the city of New Orleans." Id. art. 147.

The charter of the city of New Orleans—

"Creates all the inhabitants of the parish of Orleans, as now bounded by * * *, as a body corporate, and establishes them as a political corporation by the name of the 'City of New Orleans,' with the following powers, and no more: It shall have a seal and may sue and be sued. * * * [Section 1.] The council shall have power, and it shall be their duty, to pass such ordinances, and to see to their faithful execution, as may be necessary and proper to preserve the peace and good order of the city; * * * to organize and provide an efficient police. * * * [Section 7.] The council shall also have power * * * to establish jails, houses of refuge and reformation and correction, and make regulations for their government, and to exercise a general police power in the city of New Orleans. [Section 8.] The mayor shall keep his office at the city hall; * * * shall see that the laws and ordinances within the limits of the city of New Orleans be properly executed; * * * shall be ex-officio justice and conservator of the peace. * * * [Section 19.]" Acts 1882, No. 20, p. 14.

The act of the legislature of Louisiana (passed in 1888) creating the police board of the city of New Orleans preserves to the mayor of the city of New Orleans the power, as the commander in chief of the police force, to issue such orders as may be necessary and proper for the preservation of the peace in the city of New Orleans, and in said act it was declared that:

"It is hereby made the duty of the police force at all times of the day and night, and the members of such force are thereunto empowered, to especially preserve the public peace, to prevent crimes, detect and arrest offenders, suppress riots, mobs and insurrections, disperse unlawful or dangerous assemblages which obstruct the free passage of public streets, sidewalks, squares and places, protect the rights of persons and property," etc. Acts 1888, No. 63, p. 64.

The city of New Orleans, by her pleadings, admits the gross negligence charged in the petition in the performance of the duties

devolving upon the municipality under the constitution and laws of the state above referred to, whereby Abbagnato lost his life at the hands of a mob while in the custody of the law; and the question presented in this case is whether, on such admission of facts, the city can be held liable in damages. It is well settled that at common law no civil action lies for injury to a person which results in his death. Insurance Co. v. Brame, 95 U. S. 754–756; Dennick v. Railroad Co., 103 U. S. 11, 21; The Harrisburg, 119 U. S. 199–214, 7 Sup. Ct. 140. The rule is the same under the civil law, according to the decisions of the Louisiana supreme court. Hubgh v. Railroad Co., 6 La. Ann. 495; Hermann v. Railroad Co., 11 La. Ann. 5. In the absence of a statute giving a remedy, public or municipal corporations are under no liability to pay for the property of individuals destroyed by mobs or riotous assemblages. Add. Torts, 1305; Dill. Mun. Corp. § 959.

In the case of State v. Mayor, etc., of New Orleans, 109 U. S. 285, 3 Sup. Ct. 211, the supreme court of the United States held that the right to demand reimbursement from a municipal corporation for damages caused by a mob is not founded on contract. It is a statutory right, and may be given or taken away at pleasure. In the same case, Mr. Justice Bradley, concurring, said:

"I concur in the judgment of this case, on the special ground that remedies against municipal bodies for damages caused by mobs or other violators of law, unconnected with the municipal government, are purely matters of legislative policy, depending on positive law, which may at any time be repealed or modified, either before or after the damage has occurred, and the repeal of which causes the remedy to cease. In giving or withholding remedies of this kind, it is simply a question whether the public shall or shall not indemnify those who sustain losses from the unlawful acts or combinations of individuals; and whether it shall or shall not do so is a matter of legislative discretion, just as it is whether the public shall or shall not indemnify those who suffer losses at the hands of a public enemy, or from intestine commotions or rebellion."

If this be the rule with regard to the liability of municipal corporations for damages to property committed by mobs or riotous assemblages, a fortiori it must be the rule with regard to the liability of municipal corporations for damages resulting in the loss of life from the acts of mobs or riotous assemblages. The reason of the rule is obvious. Actions to recover from municipal corporations damages resulting from the acts of mobs and riotous assemblages are actions to hold such corporations liable in damages for a failure to preserve the public peace. The preservation of the public peace primarily devolves upon the sovereign. Under our system of government, the state is that sovereign. U. S. v. Cruikshank, 92 U. S. 542–553; Western College v. City of Cleveland, 12 Ohio St. 377. When, by the action of the state, a municipal corporation is charged with the preservation of the peace, and empowered to appoint police boards and other agencies to that end, the corporation pro tanto is charged with governmental functions in the public interest and for public purposes, and is entitled to the same immunity as the sovereign granting the power for negligence in preserving the public peace, unless such liability

is expressly declared by the sovereign. This proposition is so well recognized that not a well-considered, adjudicated case can be found in the books where, in the absence of an express statute, any municipality has been held liable for the neglect of its officers to preserve the peace. In the case of Western College v. City of Cleveland, supra, it was said:

"It is the duty of the state government to secure to the citizens of the state the peaceful enjoyment of their property and its protection from wrongful and violent acts. For the proper discharge of this duty, power is delegated in different modes. One of these is the establishment of municipal corporations. Powers and privileges are also conferred upon municipal corporations to be exercised for the benefit of the individuals of whom such corporations are composed, and, in connection with these powers and privileges, duties are sometimes specifically imposed. It is obvious that there is a distinction between those powers delegated to municipal corporations to preserve the peace and protect persons and property when they are to be exercised by legislation or the appointment of proper officers, and those powers and privileges which are to be exercised for the improvement of the property comprised within the limits of the corporation and its adaptation for the purposes of residence and business. As to the first, the municipal corporation represents the state; as to the second, the municipal corporation represents the pecuniary and proprietary interest of the individuals. As to the first, responsibility for acts done or omitted is governed by the same rule of responsibility which applies to like delegations of power; as to the second, the rules which govern the responsibility of individuals are properly applicable."

The exemption of municipalities from liability to suits for damages for the negligence of officers and agents in the execution of the governmental functions granted by the state, in the public interest, and in the absence of statutory liability, is recognized in Louisiana, as shown by the decisions of the supreme court of the state in Egerton v. Third Municipality, 1 La. Ann. 437; Stewart v. City of New Orleans, 9 La. Ann. 461; Lewis v. New Orleans, 12 La. Ann. 190; Bennett v. New Orleans, 14 La. Ann. 120; Howe v. New Orleans, 12 La. Ann. 482; New Orleans, etc., R. Co. v. New Orleans, 26 La. Ann. 478,—although Johnson v. Municipality No. 1, 5 La. Ann. 100, Clague v. New Orleans, 13 La. Ann. 275, and Chase v. Mayor, 9 La. 343, are apparently to the contrary. The Louisiana cases, as well as those of other states, are very ably reviewed, and the whole matter discussed, in a well-considered opinion of the learned judge of the eastern district of Louisiana in the case of Gianfortone v. City of New Orleans (recently decided) 61 Fed. 64. It follows, therefore, that in order to recover damages against the city of New Orleans for the taking of human life by a mob in said city, no matter what the negligence of the city officials may have been, there must be a statute of the state of Louisiana expressly or by necessary implication giving a remedy in such cases.

Section 2453 of the Revised Statutes of Louisiana reads as follows:

"The different municipal corporations in this state shall be liable for the damages done to property by mobs or riotous assemblages in their respective limits."

And article 2315, Rev. Civ. Code, as last amended, reads as follows:

"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. The right of this action shall survive in case of death in favor of the minor children and widow of the deceased or either of them, and in default of these in favor of the surviving father or mother, or either of them for the space of one year from the death. The survivors above mentioned may also recover the damages sustained by them by the death of the parent or child or husband or wife as the case may be."

Article 2316, Id., reads as follows:

"Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."

And article 2317:

"We are responsible not only for the damage caused by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody."

It is not seriously contended in this case that article 2453 of the Revised Statutes of the state warrants the maintenance of the present suit, or fixes any liability upon the city of New Orleans because of the death of Abbagnato at the hands of a mob, as recited in the petition. As we consider the statute and the fact of its existence on the statute book, it goes rather to deny the right to recover in this case than to support it, for it shows clearly that in the legislative mind the statute was necessary to fix liability upon municipal corporations for damages to property done by mobs; and the limitation of the right to recover damages to property only shows a clear legislative intent that beyond property, and for life or limb, municipal corporations should not be responsible. The entire right of the plaintiff in error to recover damages must then be based upon article 2315 and the subsequent articles of the Civil Code, above quoted. Article 2315, as originally adopted, was as follows:

"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

It was under this article that the decision in Hubgh v. Railroad Co., supra, was rendered, holding that an action for damages caused by the homicide of a free human being cannot be maintained. In regard to the article the court says:

"The provisions of this article, however general and comprehensive its terms may be, are found more than once recited in terms equally general and comprehensive in the laws of the 15th title of the 7th Partida. The article was inserted in the Code of 1809, at a time when the Spanish laws were in force. It was put and retained to this time in the Code, not for the purpose of making any change in the law, but because it was a principle which was in its proper place in a Code; a principle which would be equally recognized as a necessary conservative element of society, and equally obligatory, whether it was formally enacted in a Code or not. * * * Merlin, in giving his conclusions before the court of cassation, in the Case of Michel, Reynier et al., respecting the article 1382 of the Code Napoleon, which is identical with the article 2294 of our Code, says: 'The principle laid down in article 1382 is not new. It is drawn from the natural law; and, long before the Napoleon Code, the Roman laws had solemnly proclaimed it. Long before that Code, the French laws had recognized and assumed its existence.'"

We understand from this that the article of the Civil Code in question was not an innovation of the civil law, in force in the state, introducing new principles and establishing new duties and responsibilities which did not before exist. It is a part of a system of laws, and controlling only where, under general principles, it is applicable to the facts and liabilities of a particular case. We have shown that the article was not enforceable when the "act whatever of man" resulted in death, until the statute so declared, and this because of the intervention of other equally well-recognized principles of law. To make it applicable in case of death through negligence, the legislature of 1855 amended the article by adding thereto as follows:

"The right of this action shall survive in case of death in favor of the minor children and widow of the deceased or either of them, and in default of these in favor of the surviving father and mother or either of them for the space of one year from the death." Acts 1855, No. 223, p. 270.

As thus amended, the scope of the article was still too narrow to permit the recovery of other damages than such as the deceased himself would have had had he survived the injury (Vredenburg v. Behan, 33 La. Ann. 627); and therefore the article was again amended and re-enacted, adding thereto as follows:

"The survivors above mentioned may also recover the damages sustained by them by the death of the parent or child or husband or wife as the case may be." Acts 1884, p. 94.

Neither the amendment of 1855 nor that of 1884 enlarges the scope of the article as to the persons who may be held liable for negligence. The amendments go no further than to provide for a limited survival of the action and an enlarged rule of damages. The article is applicable now to the same persons, and to no others, as before amendment; and if, before amendment, it could not be applied so as to hold a municipal corporation liable for damages resulting from the acts of mobs and riotous assemblages, it cannot be so applied now. Before this amendment, it declared well-known principles of the civil law, but not all of them, and it controlled in cases where the application of other well-known rules and principles did not deny the action or defeat recovery. As amended, it should have the same construction and be given the same force. Before the act of 1855, it was not contended, nor could it have been successfully contended, that the article was applicable as against a municipal corporation to recover damages to either person, life, or property resulting from the acts of mobs and riotous assemblages. For these reasons, we are clear that neither expressly nor by implication does it now give a remedy in damages against a municipal corporation for negligence in preserving the public peace resulting in the loss of life by the acts of a mob. As we find no law of the state of Louisiana giving a remedy in damages against a municipal corporation for the acts done by a mob resulting in the loss of human life, we are compelled to reverse the judgment of the court below.

In the exceedingly able and interesting brief, showing great in-

dustry and research, presented to this court by the learned counsel for the defendant in error, it is said:

"The question here presented is not a street fight or murder, without any premonition on the part of the city authorities, and without culpable neglect in the discharge of their duties; nor is it the case of a police force, in its attempt to quell an insurrection, being overpowered by a mob. But, on the contrary, we have the extraordinary spectacle of a mob organizing in a city of a quarter million inhabitants, to the knowledge of the authorities, and without any efforts to disperse them; marching down the streets for a distance of a mile, armed, and in broad daylight; taking possession of a city building, and killing its inmates, for an hour or more, and until their thirst for blood was satiated,—a deed unparalleled and unheard of in the history of the world."

Before entering judgment, we feel called to say that we exceedingly regret that the conclusions of the learned counsel on the law of the case as otherwise discussed in their brief are not as well founded as is their just indignation in considering the facts; and we think it proper, in view of the well-known facts attending the Italian lynching in the city of New Orleans in 1891, to reproduce part of what was so well said by the supreme court of the United States in Ex parte Wall, 107 U. S. 265–274, 2 Sup. Ct. 569, in regard to lynching:

"It is not a mere crime against the law; it is much more than that. It is the prostration of all law and government; a defiance of the laws; a resort to the methods of vengeance of those who recognize no law, no society, no government. Of all classes and professions, the lawyer is most sacredly bound to uphold the laws. He is their sworn servant; and for him, of all men in the world, to repudiate and override the laws, to trample them under foot, and to ignore the very bands of society, argues recreancy to his position and office, and sets a pernicious example to the insubordinate and dangerous elements of the body politic. It manifests a want of fidelity to the system of lawful government which he has sworn to uphold and preserve. Whatever excuse may ever exist for the execution of lynch law in savage or sparsely settled districts, in order to oppose the ruffian elements which the ordinary administration of law is powerless to control, it certainly has no excuse in a community where the laws are duly and regularly administered."

The judgment of the circuit court is reversed, and the case is remanded, with instructions to maintain the exception of nonliability, and dismiss the plaintiff's petition.