Whitaker, Judge,
delivered the opinion of the court: The plaintiff sues the defendant for' $3,266,826.22, basing its claim on four items: (1) the failure to pay to the tribe the amount received from the sale of lands within what is known as the “Old Agency Reserve” or the “Langford Claim;” (2) failure to pay to the tribe money received from the sale of lands allotted erroneously ,to nonmembers of the tribe and later cancelled; (3) per capita payments erroneously made to nonmembers of the tribe; (4) for gold mined and removed by nonmembers of the tribe from lands alleged to be within the plaintiff’s reservation. ;
The case is before us under rule 39 (a).

*5
First Item

On June 11, 1855, a treaty between the parties was.agreed upon, later ratified on March 8, 1859 (12 Stat. 957), under the terms of which a certain reservation was set apart to the plaintiff, and under which plaintiff relinquished its claim to all other lands. Later, in 1863, a treaty was negotiated between the parties, ratified on April 17,1867 (14 Stat. 647), under which, in consideration of the sum of $262,500, the plaintiff ceded to the defendant all of its lands except a certain area therein described.
Finally, in 1893 an agreement was entered into between the parties, which was ratified by the Congress on August 15, 1894 (28 Stat. 286, 326-332), under which the plaintiff ceded to the defendant all of its unallotted lands, with certain reservations, for a consideration of $1,626,222. Among the lands reserved from the cession was a tract described as follows:
* * * Also that there shall be reserved from said cession the land described as follows: “Commencing at a point at the margin of Clearwater River, on the south side thereof, which is three hundred yards below where the middle thread of Lapwai Creek empties into said river; run thence up the margin of said Clearwater River at low-water mark, nine hundred yards to a point; run thence south two hundred and fifty yards to a point; thence southwesterly, in a line to the southeast corner of a stone building, partly finished as a church; thence west three hundred yards to a point; thence from said point northerly in a straight line to the point of beginning; * * *
The plaintiff alleges that these lands were later sold by the United States and the proceeds thereof were deposited in the general funds of the Treasury of the United States, and it is alleged that the plaintiff has received no compensation therefor. Whether or not these allegations are true, plaintiff is not entitled to recover on this item, because in the article reserving these lands from the cession it is provided that the United States shall purchase them upon certain conditions, whereupon the right of occupancy of the tribe in the land “shall terminate and cease and the complete title *6 thereto immediately vest in the United States.” The lands were purchased by the United States, the condition having been complied with, and upon their purchase, in accordance with the agreement, the right of occupancy of said Indians in said described tracts terminated and ceased and the complete title thereto immediately vested in the United States.

Second Item

By the treaty of 1863 the plaintiff relinquished to the United States all the lands previously reserved for their use and occupation by the treaty of 1855, except a certain described tract. This tract was reserved for them “for a home, and for the sole use and occupation of said tribe.” The treaty provided for a survey of the lands and for the allotment of 20 tillable acres thereof to each male person of twenty-one years or over. These allotments were to be “set apart for the perpetual and exclusive use and benefit of such assignees and their heirs.” It was also provided that the “residue of the land hereby reserved shall be held in common for pasturage for the sole use and benefit of the Indians.”
After these, and perhaps other, allotments had been made, the plaintiff and the defendant entered into the agreement of 1893, under the terms of which the plaintiff ceded to the defendant “all the wmllotted lands within the limits of said reservation,” with certain reservations. It later developed that of the allotted lands not sold 10,512.68 acres had been erroneously allotted to persons who were not members of ■the Nez Percé tribe. Accordingly, these allotments were cancelled. Of the total of 10,542.68 acres of allotments which were cancelled, 3,336.94 acres were reallotted to members of the Nez Percé tribe. Of the balance, 5,861.5 acres were patented on homestead entries, Y4.55 acres were set apart for the Craig’s Domain Claim, and 1,263.69 acres are vacant. The plaintiff sues for the value of all the cancelled allotments, except those which were reallotted to members of the Nez Percé tribe.
We are of opinion that plaintiff is entitled to recover on this claim. The only lands ceded to the defendant by the plaintiff were the “unallotted” lands. The 10,542.68 acres had been allotted, although erroneously, and, therefore, were *7 not included in the cession. Title to these lands never passed from the plaintiff to the defendant. When these allotments were cancelled, title to the lands, therefore, reverted to the plaintiff, their original owner.
If there could.be any doubt that these erroneously allotted lands were not ceded, the negotiations between the Indians and the defendant’s commissioners leave no question about it. Throughout the negotiations they speak only of the unal-lotted lands. Nowhere is there a suggestion that any part of the allotted lands should be ceded. There was no suggestion that some of them may have been erroneously allotted, and, therefore, no exception of these from the lands retained by the plaintiff.
On the sixth day of council one of the Indians requested the commissioners to “bring the amount of the number of acres on the reservation before allotment was made and also the amount of land that has been allotted to the Indians.” “Then,” it was said, “we can find out how much there is on the outside of the allotments.” The following day the commissioners reported as follows (Senate Ex. Doc. 31, p. 47):
Acres
The reservation contains- 756,968
The allotments comprise-a.— 182,234
Leaving a surplus of lands_ 574,734
Reserved for wood and timber- 64,820
509,914
if the amount of timber land is reduced to 34,820 acres it will add to surplus_ 30,000
And the surplus to be sold will amount to_ 539,914
For these the commissioners originally proposed to pay * price of $2.50 an acre, but, after seven days of meeting in council, on the eighth day they finally agreed to pay $3.00 an acre. The price paid at $8.00 an acre was for 542,074 acres, a total of $1,626,222. This was the entire acreage in the reservation, except 32,660 acres reserved for timber lands and the 182,234 acres that had been allotted, which included the 10,542.68 acres that had been erroneously allotted. It follows that the Government did not acquire and did not pay for these 10,542.68 acres.
*8 On November 8, 1895, the President issued a proclamation which, after reciting the cession of 1898, declared “that all of the unallotted and unreserved lands acquired from the Nez Perce Indians, by said agreement, will, at and after the hour of 12 o’clock, noon, (Pacific Standard time) on the 18th day of November 1895 and not before, be opened to settlement. * * *” The proclamation recited that the lands to be opened for settlement were particularly described in a schedule attached. This schedule is not before us, but it is evident it included the acreage in question because the report of the Assistant Secretary of the Interior in this case shows that of this acreage 5,867.5 acres have been patented in homestead entries.
This proclamation of the President was an expropriation of these lands for the benefit of the defendant, both the acreage later disposed of and the vacant land, for which the plaintiff is entitled to a money judgment under the jurisdictional act (45 Stat. 1249) conferring jurisdiction on this court to adjudicate—
* * * all legal and equitable claims of whatsoever nature * * * arising under or growing out of the original Indian title * * * including all title, claim, or rights growing out of [the treaties above mentioned] * * * and more particularly as to the following claims: * * *
2. Claim for certain lands included in canceled allotments * * * and thereafter disposed of by the United States, said lands not being included in the area ceded by said treaties or said agreement of May 1, 1893. * * *

Third Item

Under the agreement of 1893 the defendant was obligated to pay to the individual members of the Nez Percé Tribe the $1,626,222 agreed to be paid for the lands ceded under the agreement. Plaintiff says that $41,550.05 of this amount was paid to persons not entitled thereto because the allotments of land to them had been erroneously made, because made to nonmembers of the tribe, and were later cancelled.
By article III of the agreement of 1893, it was provided that the consideration of $1,626,222 for the ceded lands should *9 be paid to the plaintiff Indians per capita. If some part of the money for distribution has been paid to nonmembers of the tribe, the plaintiff, of course, is entitled to recover it. In many instances, however, it is not clear from the report of the General Accounting Office, which is the only proof on this feature of the case, that the payments set out were payments to nonmembers of the tribe or their representatives.
As the case is submitted under rule 39 (a) it is not necessary for us to determine at this stage of the proceeding the amount paid to nonmembers of the tribe.

Fourth Item

Lastly, the plaintiff sues for the value of gold alleged to have been removed from the reservation by white people prior to the agreement of 1893. Plaintiff relies on the following portion of article II of the treaty of 1855, later reaffirmed by the agreement of 1893, which reads:
All which tract shall be set apart, and, so far as necessary, surveyed and marked out for the exclusive use and benefit of said tribe as an Indian reservation; nor shall any white man, excepting those in the employment of the Indian department, be permitted to reside upon the said reservation without permission of the tribe and the superintendent and agent; * * *
There is no allegation that white people went upon plaintiff’s lands at the direction of the defendant or even at its instigation. Liability is predicated solely on the defendant’s failure to keep them out.
The purpose of the above provision was to set apart absolutely the lands described for the exclusive use and benefit of the plaintiff. The second clause, that no white man should be permitted to reside on the reservation, was inserted only to emphasize the statement in the first clause that the lands were set apart “for the exclusive use and benefit of said tribe.” We are clearly of opinion that no intention can be gathered therefrom that the defendant intended to guarantee that no white man should reside thereon and that it should respond in damages if they did.
Independent of treaty, the defendant as the sovereign power was under the duty of protecting the plaintiff in the *10 peaceful occupation and possession of its property; Cherokee Nation v. Hitchcock, 187 U. S. 294; but this duty, of course, goes no further than a duty to use its forces to endeavor to prevent a threatened wrong and to afford it redress in its courts against the wrongdoer if the wrong is committed. No one has ever asserted that because a person’s rights are invaded by a stranger the sovereign is liable in damages for a failure to afford adequate protection. Cf. Choctaw and Chickasaw Nations v. United States, 75 C. Cls. 494. This is true even though the sovereign be grossly negligent in failing to afford the necessary protection against the threatened danger. The sovereign is not liable for failure to perform a governmental function. Gianfortone v. City of New Orleans, 61 Fed. 64; City of New Orleans v. Abbagnato, 62 Fed. 240, 245-246; Campbell v. Montgomery, 53 Ala. 527; Western College v. Cleveland, 12 Ohio St. 375; Louisiana v. New Orleans, 109 U. S. 285, 291, concurring opinion by Mr. Justice Bradley; and other cases collected in 13 A. L. R. 751, 23 A. L. R. 297, and 44 A. L. R. 1138.
We are satisfied that it was not intended by the treaty to impose on the defendant any greater duty to protect plaintiff in the peaceful occupation and possession of its property than already existed. Certainly there was not expressly assumed an obligation to respond in damages, if the protection afforded was inadequate; nor will such an obligation be implied unless such implication is inescapable. Robinson v. Greeneville, 42 Ohio St. 625; Western College v. Cleveland, supra; Gianfortone v. New Orleans, supra. The treaty says that white persons shall not be permitted to reside on the reservation, but it does not say that if they do the United States shall be liable in damages for any injury done by them.
In Leighton v. United States, 161 U. S. 291, 296, the court considered the liability of the United States and the Indian Tribe for depredations. It said that the obligation assumed by the Indians under treaty “to cease all hostilities against the persons and property of its [United States] citizens” was a promise “to keep the peace, and not a promise to pay if the peace is not kept.” Here the United States said that white persons would not be permitted to reside on the reser *11 vation, but it did not agree to pay damages inflicted if they did so. Cf. Blackfeet, et al. Nations v. United States, 81 C. Cls. 101, 119-123.
The agreement was intended to do no more than to make it as plain as possible that the reservation was intended for the sole use and benefit of the tribe and that the defendant would do what it could to effect that, or, failing in this, to afford plaintiff redress in its courts against the wrongdoer.
We are of opinion the plaintiff is not entitled to recover on this item.
It results that the plaintiff is entitled to recover the value of the number of acres of cancelled allotments which were opened to homestead entry by the proclamation of the President on November 8, 1895 (29 Stat. 873-876), with interest at 5 percent per annum; that plaintiff is entitled to recover whatever part of the $1,626,222 was paid to nonmembers of the tribe and for which the defendant has not accounted to the plaintiff, with interest at 5 percent per annum; that plaintiff is not entitled to recover the amount received from the sale of or for the value of the lands in the Old Agency Reserve which were purchased by the defendant; and that plaintiff is not entitled to recover the value of any gold removed from its reservation. It is so ordered.
MaddeN, Judge; Jones, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.