Campbell, Chief Justice,
delivered the opinion of the court:
The jurisdictional act under which this suit is brought is found in chapter 216, 35 Stats., 444, entitled “An act to authorize the Secretary of the Interior to issue patents in fee to purchasers of Indian lands under any law now existing or hereafter enacted, and for other purposes,” and is section 26 of said act, as follows:
“That the Court of Claims is hereby authorized to consider and adjudicate and render judgment as law and equity may require in the matter of the claim of Clarence W. Turner, of Muskogee, Oklahoma, against the Creek Nation for the destruction of personal property, and the value of the loss of the pasture of the said Turner, or his assigns, by the action of any of the responsible Creek authorities, or with their cognizance and acquiescence, either party to said *144 cause in the Court of Claims to have the right of appeal to the Supreme Court of the United States.”
One of the first question presented is whether the United States can be made a party to the suit. The plaintiff sought to make them a party, and they through their Attorney General objected. The United States can not be sued without their consent, and there is nothing in the jurisdictional act authorizing the United States to be sued. We are clearly of the opinion that they can not be made parties in this proceeding. Green v. Menominee Indians, 46 C. Cls., 68; 47 Ib., 281; 233 U. S., 558.
Another question is as to whether the Creek Nation has been brought before the court. The jurisdictional act does not prescribe the manner of service upon the nation. The rules of the Court of Claims are not adapted to suits against others than the United States, and the statute provides that in suits against the United States a copy of the petition shall be served upon the Attorney General, who shall appear and defend. As a matter of fact, when the petition in this case was filed a copy of it was mailed to the principal chief of the Creek Nation. No application was made by the plaintiff to the court to prescribe any service.
It may be noted that said chapter 216, 35 Stats., 444, contains several sections referring to this court, with the right to hear and determine certain claims. Section 5 refers a claim against the Choctaw Nation and prescribes that notice of the suit shall be served on the governor of that nation, and that the Attorney General of the United States shall appear and defend on behalf of said nation. Section 2 refers the claim which was considered in the case of Green v. Menominee Indians, supra. That section provided that the Menominee Indians, through its business committee, were authorized to employ an attorney to defend in said action, and the Attorney General of the United States filed a demurrer on behalf of the defendants. Section 16 of said chapter refers a claim against certain Choctaw and Chickasaw freedmen to the court, prescribes the method of service of a petition, and authorizes an appearance by an attorney to be employed by the freedmen. Section 27 refers a claim against the Choctaw Nation and prescribes the method of *145 serving the petition. It thus appears that as to claims referred in said chapter there is provision for service upon the defendants, or appearance by them, except in the case under consideration, and it is usual where suits have been authorized by Congress against nations or tribes of Indians that the method of bringing them before the court has been prescribed by the acts authorizing the suits.
The method of bringing a defendant who is sued before a court is a matter of statutory regulation. The Creek Nation was at the time of the action complained of in this case vested with certain powers of government over the Indians composing it, but the Court of Claims can not know upon whom service of process should be executed to bring the nation properly before the court unless the act of Congress prescribes the service that is necessary. Congress may do this, as it may authorize a suit in the exercise of its plenary power of control over Indian affairs. Having failed to do so, we think that the jurisdictional act is defective unless the appearance made by the attorney for the nation is sufficient to bring the defendant into court.
Finding XIII shows what transpired in this court with reference to an appearance by the defendant. Prior to any actual appearance testimony had been taken on both sides, and it was printed by leave of court. No question of jurisdiction or service was raised until after this testimony had been taken and printed. The attorney who took the testimony representing the Choctaw Nation was the regularly employed attorney of said nation under contract authorized by its national council and approved by the Secretary of the Interior. Among his other duties was that of appearing in all courts at the request of the principal chief to defend said nation. The actual appearance in court by the filing of any pleading or brief occurred after the taking of the testimony, and at that time the question of the court’s jurisdiction was raised. We thus state the question, but it is not our purpose at this time to decide it because the case was submitted upon said motion and without waiving it upon the merits, and we prefer to rest our decision upon the latter phase of the case.
*146 The jurisdictional act does not create or declare any liability against the Creek Nation in favor of the plaintiff. Its purport is to furnish a forum where the question of liability may be determined. Green v. Menominee Indians, supra. The act authorizes the court to “ adjudicate and render judgment as law and equity may require in the matter of the claim of Clarence W. Turner ” against the Creek Nation for certain things therein set out. The reference to the destruction of property and loss of pasture by the action of the responsible Creek authorities, or with their cognizance and acquiescence, is merely descriptive of the claim and does not show a purpose on the part of Congress to declare that there is a liability therefor because in a preceding part of the act the court is directed to “ render judgment as law and equity may require.”
The plaintiff claims that Pussy, Tiger & Co. made a contract with Jacob Knight, judge of the fifth judicial district of the Muskogee Nation, by virtue of which the plaintiff became entitled to a large pasture, and that he subsequently granted the right to Waggoner & Son to graze their cattle upon said pasture for a large consideration, namely, $27,500 per year; that while plaintiff was building the fence around said pasture the same was utterly destroyed by Indians, and that he lost not only in large part the material and labor expended in building so much of the fence as had been completed but also the profits he would have made under the contract with Waggoner & Son. He claims several other items, which will be mentioned, and contends that his right of action is for a breach of contract. The findings show that the plaintiff had agreed to pay $10,000 per year to the Indian members of Pussy, Tiger & Co., who were Creek citizens ; also that he was to pay 5 cents per acre per year for land in the said pasture, and that he was building the fence required to inclose it. The contract alleged to have been made between Judge Knight and Pussy, Tiger & Co. appears to have been made in October, 1890. In April, 1891, the plaintiff sent $2,500 to Moty Tiger to be distributed among said Indians as the first quarterly payment upon the sum agreed to be paid to them. About the 1st of April he sent *147 $1,250 in scrip, a legal tender for taxes and due to the Creek Nation, to Moty Tiger to be paid upon the tax of 5 cents per acre upon said pasture. This sum was not received by the authorities and was returned to Moty Tiger, plaintiff’s agent. At the time the fence was destroyed something over $12,000 had been expended by plaintiff in and about the fence incident to its building.
The plaintiff contends and requests the court to find that he lost the difference between the amount which Waggoner & Son had agreed to pay for the use of the pasture for 3 years ($82,500) and the amount which he was to pay during said 3 years as tax to the Creek Nation at 5 cents per acre, which he fixes at $5,000 per year, or $15,000 in all. Under no phase of the case could this result follow, because if it be assumed that there was a valid contract and a breach of it for which the nation should be held responsible, it is difficult to understand from the contract how there could be any such profit. The alleged contract provided that the owner of the pasture should pay 5 cents per acre per year, and the number of acres in the pasture was 256,000, according to the description in the contract, the tax on which would be $12,800 per year; so that if we assume that Waggoner & Son were to pay $82,500 for the term there must be deducted from that sum the tax which plaintiff should have paid for 3 years ($38,400), and in addition $30,000 which he would have paid to the said Indians for said time, making an aggregate of $68,400. Besides this, before he could get any profits there should be deducted the cost and expense of building the fence, and upon it he had expended something over $12,000 at the time of its destruction, and something more than three-fourths of it had been completed. It thus appears that the sum of these expenditures would aggregate at least $80,400, and as the facts do not show what it would have cost to complete the fence it is manifest that the plaintiff shows no loss of profits. Of course, if his payment on account of tax had been based upon an acreage of 100,000 acres instead of 256,000, there would have been a difference in his favor. Upon what theory the plaintiff can maintain that the tax he was to pay amounted to $5,000 per year, *148 instead of the amount required by the law and the plain terms of the contract, is not apparent. The contract provided for a pasture 25 by 16 miles in extent, comprising 400 square miles, and the plaintiff’s agent was building a fence to inclose that area, having completed about 60 miles in length of it, with about 20 miles unfinished at the time it was cut. By reference to the bill in equity shown in the findings to have been brought at the instance of plaintiff in the name of Waggoner & Son in the United States Court for the Indian Territory against the principal chief and the said judge, Knight, as defendants to restrain them from taking action to remove the fence, the averments are made that the acreage was 250,000, more or less, and that the tax on that acreage had been paid. The averment as to the payment of tax was erroneous, for it had not been paid, but the averment as to acreage is nearer true. Certainly the plaintiff must be held to have known that the tax he was to pay was 5 cents per acre per year on the acreage described in the contract upon which he relies.
The plaintiff also claims the $2,500 which he paid to said Indians, but that is not recoverable if he could otherwise recover, because that sum was paid to the Indians under the arrangement between him and them above adverted to and not under the contract upon which he sues. The item of tax which he claims of $1,250 would not be recoverable for the reason that the nation never received it.
As above stated, he had expended something over $12,000 in and about the construction of the fence, and he recovered about $2,000 in value of the materials after the fence had been cut, making a net loss to him of $10,078.16. Several times he applied to the Indian Nation to reimburse him, and on each occasion he made claim for said sum of $10,078.16. That sum appears, approximately at least, to have been the limit of his loss.
The plaintiff predicates his rights under the alleged contract upon the effect of an enactment of the Creek National Council passed in October, 1889, and set out in Finding IY. It is apparent from reading this enactment that one of its purposes was to curtail the practice of building large pas *149 tures “ to the detriment of the general welfare of the nation.” The act provides for the removal of certain large pastures greater in extent than 1 mile square. It is, however, provided that “ where extensive pastures greater in extent than 1 square mile can be located on the borders of the nation to. the benefit of any neighborhood by affording protection against the influx of stock from adjoining nations the same may be located ” under the conditions mentioned in the act. The persons who may secure these “ protective pastures ” are “ citizens of the district,” and an election by the voters in the neighborhood concerned is required. The reason for limiting the right to acquire pastures to “ citizens ” is manifest; the parties would then be subject to the laws and courts of the nation; whereas if outside parties were allowed to acquire pastures a different result could follow. Blackstone and Turner, desiring to secure a pasture, originated and put into effect a plan whereby about 100 full-blooded Indians in the territory affected by the pasture would be brought into an association and an application be made under said act for an election to authorize the pasture and the Indian members of the association would constitute voters to pass upon the question. An election was ordered and the pasture was defeated. A second election was held and the result declared in favor of the pasture. Thereafter the contract in question was made. Several years after the grievances complained of by the plaintiff the supreme court of the nation decided that “ the pasture was legal, having been built in accordance with the law then in existence.” (Finding XI.) We do not know what facts were before that court, but upon the facts before us we should hesitate to say that “the pasture was legal.” The application for the second election was made by Pussy, Tiger & Co., the leading spirit in which were Turner and Blackstone, who were not Creek citizens, and Pussy and Tiger, who were citizens. The petition vaguely referred to the size of the pasture and less carefully expressed its bounds than is stated in the contract subsequently made. The said enactment does not prescribe the form of proceedings necessary to secure the pasture. It provided that application shall be made by “ citizens.” The application for the pasture in *150 question was made by Pussy, Tiger & Co., not all of whom were citizens. In a number of States provision is made for the establishment of fence districts, and where the statute provides that the application shall be made by freeholders residing in the district it is held that the petition must show that the applicants are freeholders residing in the district, and that otherwise the court receiving the application does not acquire jurisdiction. Flowers v. Grant, 129 Ala., 275; Mize v. Speight, 82 Ga., 397; Cain v. Davie County Commissioners,, 86 N. C., 8. We think that it would be too exacting to test the petition of Pussy, Tiger & Co. by any strict rules of pleading. However, the findings show that the Indians who voted upon the question, being Indians in the “neighborhood ” affected, were illiterate and poor and were brought into said association because they would undertake to carry out the purposes of its promoters. The plan under which Pussy, Tiger & Co. was organized contemplated that the said Indians should be paid each $100 per year during the term of the contract in the event the pasture were established; and subsequently, in April, 1891, Turner paid to Moty Tiger $2,500 to be distributed among said Indians. At the said election a majority of the membership of Pussy, Tiger & Co. voted, and the affirmative vote was 57. It is therefore apparent that those by whose votes the election was carried were pecuniarily interested in the result and became the recipients of money advanced by Turner.
The size of the pasture suggested in the petition as “not less than 100,000 acres ” was misleading in view of the fact that the acreage actually covered by the contract was an area 25 by 16 miles, making 400 square miles of land and comprising 2J times the area suggested in the petition. The facts do not show that that amount of acreage was necessary or proper to constitute the “ protective ” fence contemplated by said act, nor do we think that the method of acquiring the pasture was in keeping with the spirit and purpose of said act. Thereafter the contract in question was made, but as some of the membership of Pussy, Tiger & Co. were not citizens the question is whether any right can grow out of the contract authorized, as above stated, and made.
*151 Said statute of the Creek Nation plainly contemplates that any contract made under its provisions should be with citizens of that nation. We can not sanction the obtaining of its benefits by indirection. Unless all of the members of Pussy, Tiger & Co. were citizens the purposes and intent of the act were violated. Besides this, section 2116, Revised Statutes, forbids a contract whereby a noncitizen of said nation could make and secure a lease of said pasture or “ any title or claim thereto.” Said section declares that a contract, such as the facts show the one under consideration to be, shall have no validity. 18 Op. Atty. Gen., 285; Cherokee Strip Live Stock Assn. v. Cass Land Co., 133 Mo., 394. It is a general rule that no right of action can grow out of a contract made in violation of the terms of a statute or the policy of the law. Harris v. Runnels, 12 How., 79, 82; Burbank v. Conrad, 96 U. S., 291, 302; Harriman v. No. Securities Co., 197 U. S., 244, 298. The alleged contract was not authorized by the law of the Creek Nation. Manifestly the plantiff can not recover upon it.
The act under which the plaintiff claims provided that there should be a tax upon the holder of the pasture of not less than 5 cents per acre per year, and that act was by express reference carried into the said contract made between Pussy, Tiger & Co. and Jacob Knight, judge of the Deep Fork district. It was made by the act the duty of the said judge to collect said tax, “ commencing his assessments from the date of contract,” and he was required to pay the same into the National Treasury quarterly, beginning with the months of January, April, July, and October of each year. No payment of said tax was made or tendered by Pussy, Tiger & Co. until about the 1st of April, 1891, although the contract was made in October, 1890. The only tender which they actually made was $1,250 in scrip or certificates of said nation, a legal tender for taxes and dues, and this tender was made through Moty Tiger about the 1st of April, 1891. He delivered the certificates to the said judge, to be delivered by him to the Treasurer, and the Treasurer declined to receive them. They were thereupon returned by the said judge to Moty Tiger, plaintiff’s agent. The payment of tax due in *152 January had not been made or tendered, nor was the tender made in April sufficient. Instead of paying $1,250 per quarter, there was a liability upon the owners of the pasture to pay 5 cents per acre upon 256,000 acres per year, or a total of $12,800 per year. Their tender therefore should have been $3,200 instead of $1,250, and under the terms of their contract $3,200 should have been paid on or before the 1st of January as well as a similar amount on or before the 1st day of April. The enactment under which they claimed the pasture provided that if “ any owner of pasture shall fail to make any quarterly payment or fail to comply with any of the obligations embraced in the contract with the judge, then he shall forfeit all the franchise granted by the terms of his contract, and the district judge shall so declare and enforce such forfeiture.” The method of enforcing this forfeiture was a summary one. The owners of the pasture, if any lawful pasture had existed, were in default and their franchise was subject to forfeiture.
From the very beginning complaints were made against the erection of said fence, and plaintiff and his representatives knew of them. Threats of its destruction were made, which grew in intensity until they finally resulted in. a large body of Indians getting together and utterly destroying the fence so far as it had been then completed.
The lands sought to be inclosed were part of the public domain of the said Creek Nation, the property being held in community, and the right to graze cattle upon the lands belonged to all of the citizens of the nation. Some of the parties who led in the destruction of the fence lived outside of the neighborhood, but grazed their cattle upon the lands in question.
Plaintiff’s petition avers that the damage was inflicted by “a mob of Indians of the Creek or Muskogee Nation or Tribe”; and if that be true the Creek Nation is not to be held responsible for the mob’s action. It can be said of the Creek Nation, as was said of the Cherokee Nation, that it has “many of the rights and privileges of an independent people. They have their own constitution and laws and power to administer their internal affairs. They are recog *153 nized as a distinct political community, and treaties have been made with them in that capacity.” Delaware Indians v. Cherokee Nation, 193 U. S., 127, 144. They are not sovereign to the extent that the Federal or State Governments are sovereign, but this suit is predicated upon the assumption that their laws are valid enactments, and it recognizes the separate existence of the Creek Nation. When, therefore, the effort is made to hold them responsible as a nation for the illegal action of a mob we must apply the rule of law applicable to established governments under similar conditions. It is a familiar rule that in the absence of a statute declaring a liability therefor neither the sovereign nor the governmental subdivisions, such as counties or municipalities, are responsible to the party injured in his person or estate by mob violence. Louisiana v. Mayor, 109 U. S., 285, 287, 291; Hart v. Bridgeport, 11 Fed. Cas., 6149; Gianfortone v. New Orleans, 61 Fed., 64; C ity v. Abbagnato, 62 Fed., 240; Murdock Grate Co. v. Commonwealth, 152 Mass., 28, 31.
There is another view which reaches the same result so far as this case is concerned. The three groups of Tudiauq moving with one purpose, and that to destroy the fence, were led severally by Isparecher, a leader among the full bloods, who used and had the right to use the lands sought to be inclosed for pasturing his cattle; by National Treasurer Moore, who enjoyed a similar privilege; and by Fixico, who resided in the “neighborhood” of the pasture. The other two leaders were citizens of the Creek Nation but lived some miles from the lands in question. Participating in the act complained of were citizens living within the pasture confines and others living outside of them.
In our view of die question, Waggoner & Son, having turned their cattle in to graze upon said lands, were intruders, and the fence under the facts found was a public nuisance. As such it was liable to abatement. The duty to abate a public nuisance rests primarily on the public authorities, but it is well settled that individuals who suffer special injury therefrom may abate a public nuisance. They do so at their own risk and are liable for any damage done in *154 excess of that necessary to properly abate the nuisance. That the Indians concerned did more damage in and about the entire destruction of the fence and the partial destruction of the plaintiff’s materials seems apparent, but for that damage the individuals who did it became jointly and severally liable, and the Creek Nation is not responsible for it.
The plaintiff urges that there was a custom recognized by said nation for noncitizens to acquire pastures through an arrangement with citizens, whereby the latter would acquire the right and assign or sublet it to a noncitizen. We are dealing, however, with a statute, and the plaintiff claims under that statute. We do not think the custom referred to, if there were such a custom, can be looked to in order to affect the meaning of said statute. The contract which plaintiff sets up was executed about a year after the enactment of the statute, and the time was too short in which to establish any custom contrary to its terms. The case of Wassom v. Willison, 58 S. W., 574, which plaintiff cites, recognizes the validity of a lease made under acts of the Creek Nation amendatory of the said act of 1889, which had been assigned to a noncitizen, to the extent that the due execution of the lease by the proper authorities and its introduction in evidence afforded prima facie proof of its validity and cast upon the defendant the burden of showing that it had not been consented to by the Indians affected. The case also recognizes that proof of the invalidity of the lease might be made and that proof is made in the instant case. Other cases which may be consulted in this connection are Hackett v. Alston, 58 S. W., 675; Cass v. Hall, 46 S. W., 180; Johnson v. Riddle, 240 U. S., 467.
We do not think that the wrongs complained of show a breach of contract by said nation. Under the facts found any right of action would be for a tort. State of Louisiana v. Mayor, supra; German Bank v. United States, 148 U. S., 573-579.
We have considered the case without intending to commit ourselves upon the question as to whether or not this court has jurisdiction under the terms of the jurisdictional act of an action for tort. Under the general statute applicable *155 to the Court of Claims it has no jurisdiction of an action sounding in tort.
We conclude that the Creek Nation is not liable to the plaintiff, and his petition must, therefore, be dismissed. And it is so ordered.
Atkinson, Judge, Barnet, Judge, and Booth, Judge, concur.
Downey, Judge, took no part in the decision of this case.